# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 52
In the Matter of Nonhuman Rights
Project, Inc., &c.,
        Appellant,
    v.
James J. Breheny, &c., et al.,
        Respondents.

Monica L. Miller, for appellant.
Kenneth A. Manning, for respondents.
Martha C. Nussbaum; Protect the Harvest et al.; John Berkman et al.; Christine M. Korsgaard; Gary L. Comstock et al.; Jane H. Fisher-Byrialsen et al.; American Veterinary Medical Association et al.; National Association for Biomedical Research; Edwin Cameron; Mahinda Deegalle et al.; Joe Wills et al.; Laurence H. Tribe et al.; New York Farm Bureau et al.; Association of Zoos & Aquariums et al.; Randall S. Abate et al.; Carol Bakhos et al.; Christina Nellist et al.; Peter Singer et al.; Shannon Minter et al.; Richard L. Cupp, Jr.; Maneesha Deckha; K.S. Panicker Radhakrishnan; Andrew Linzey et al.; Animal Legal Defense Fund, amici curiae.

DiFIORE, Chief Judge:

For centuries, the common law writ of habeas corpus has safeguarded the liberty rights of human beings by providing a means to secure release from illegal custody. The question before us on this appeal is whether petitioner Nonhuman Rights Project may seek

- 1 -

habeas corpus relief on behalf of Happy, an elephant residing at the Bronx Zoo, in order to secure her transfer to an elephant sanctuary.  Because the writ of habeas corpus is intended to protect the liberty right of *human beings* to be free of unlawful confinement, it has no applicability to Happy, a nonhuman animal who is not a "person" subjected to illegal detention.  Thus, while no one disputes that elephants are intelligent beings deserving of proper care and compassion, the courts below properly granted the motion to dismiss the petition for a writ of habeas corpus, and we therefore affirm.

I.

Petitioner Nonhuman Rights Project is a not-for-profit corporation that characterizes its mission as seeking to establish that "at least some nonhuman animals" are "legal persons" entitled to fundamental rights, including "bodily integrity and bodily liberty."  In furtherance of this mission, petitioner has commenced myriad proceedings in New York and other states on behalf of chimpanzees and elephants, arguing that these nonhuman animals are legal "persons" being unlawfully confined and, as such, they are entitled to the remedy of habeas corpus.  Petitioner's efforts have been unsuccessful, with no court granting such petitions and most of these courts dismissing the proceedings on the basis that nonhuman animals are not legal "persons" with liberty rights protected by the writ of habeas corpus (*see Matter of Nonhuman Rights Project, Inc. v Lavery*, 152 AD3d 73, 77 [1st Dept 2017], *lv denied* 31 NY3d 1054 [2018]; *People ex rel. Nonhuman Rights Project, Inc. v Lavery*, 124 AD3d 148, 150 [3d Dept 2014], *lv denied* 26 NY3d 902 [2015]; *Rowley v City of New Bedford*, 99 Mass App Ct 1104, 159 NE3d 1085 [Mass App Ct 2020], *review denied* 486 Mass 1115, 165 NE3d 159 [2021]; *Nonhuman Rights Project, Inc. v*

*R.W. Commerford and Sons, Inc.*, 192 Conn App 36, 47-48, 216 A3d 839, 845-846 [Conn App 2019], *cert denied* 330 Conn 920 [2019]; *see also Matter of Nonhuman Rights Project, Inc. v Presti*, 124 AD3d 1334, 1335 [4th Dept 2015], *lv denied* 26 NY3d 901 [2015]; *Matter of Nonhuman Rights Project Inc. v Stanley*, 2014 NY Slip Op 68434[U] [2d Dept 2014]).

Undeterred, in 2018, petitioner commenced this habeas proceeding in Supreme Court against respondents James J. Breheny, Director of the Bronx Zoo, and the Wildlife Conservation Society, the organization that operates the Zoo and promotes conservation efforts to preserve wildlife worldwide. Petitioner sought a writ of habeas corpus "on behalf of Happy," an Asian elephant that petitioner claimed was unlawfully confined at the Zoo in violation of her right to bodily liberty. Happy, who has been in captivity since she was approximately one year old, has resided at the Bronx Zoo for the last 45 years. Unfortunately, Happy's original elephant companion was euthanized in 2002 due to injuries sustained in an altercation with other resident elephants. Happy was then paired with another companion for several years until that elephant was euthanized after falling ill. The Zoo then announced that it would not be acquiring more elephants and would eventually end its captive elephant program. Thus, Happy and another female elephant, Patty, are the only remaining elephants at the Zoo today and they are housed separately due to their hostile relationship.

In seeking habeas relief, petitioner did not dispute that Happy's residence at the Zoo—which is accredited by the Association of Zoos and Aquariums and regulated by the federal Animal Welfare Act (*see generally* 7 USC § 2131)—complies with all applicable federal and state statutes and regulations governing elephant care. Further, although

petitioner contended that Happy does not have sufficient direct social contact with other elephants as a consequence of her current living situation, petitioner did not otherwise allege that Happy is subjected to cruel, neglectful, or abusive treatment. Nevertheless, noting that Happy is an "extraordinarily cognitively complex and autonomous nonhuman" animal, petitioner argued that she should be "recognized as a legal person with the right to bodily liberty protected by the common law" and immediately released from "unlawful imprisonment" at the Zoo. Petitioner acknowledged, however, that Happy could not safely be released to wander the city streets or even to the wild, requesting instead that she be transferred to an "appropriate sanctuary," preferably one chosen by petitioner, where she could potentially be integrated with other elephants.

To support its request, petitioner proffered affidavits from several experts specializing in elephant study and care attesting to the general characteristics of elephants. These experts asserted that elephants are "autonomous beings" inasmuch as they "direct[] their behavior based on some non-observable, internal cognitive process, rather than simply responding reflexively." Further, they explained—and it is essentially undisputed—that elephants are intelligent beings, who have the capacity for self-awareness, long-term memory, intentional communication, learning and problem-solving skills, empathy, and significant emotional response. These experts did not, however, comment on Happy's particular circumstances, the adequacy of her environment, or the care she receives at the Zoo.

The Zoo respondents opposed petitioner's application and, as relevant here, requested dismissal of the petition for lack of standing and failure to state a cause of action.

Respondents argued that there was no legal basis for habeas relief and that Happy's living conditions comply with all relevant laws and accepted standards of care. The Bronx Zoo's Chief Veterinarian proffered an affidavit detailing the Zoo's efforts to "ensure Happy's continued physical and psychological well-being and health" and averring that Happy is "currently healthy and well-adapted to her present surroundings." He opined that removing Happy from her long-term home would cause her "substantial stress" and "create a serious risk to her long-term health." The Associate Director of the Bronx Zoo also submitted an affidavit describing the Zoo's compliance with elephant management and care standards and accreditation requirements, Happy's routine medical care, her physical accommodations, and her comfort and familiarity with her caregivers. Finally, respondent Breheny—Director of the Bronx Zoo—explained that Happy was housed in a separate enclosure adjoining Patty's because Happy "has a history of not interacting well with other elephants," but she is nevertheless able to interact with Patty through "sound, olfaction, and touch." Breheny pointed out—and the elephant sanctuary in question conceded—that unrelated elephants living together in captivity may have acrimonious relationships and, thus, a transfer could not guarantee Happy increased interaction with other elephants. Petitioner contested this point in reply, asserting that elephants such as Happy may be able to form positive social relationships in a sanctuary environment.

Supreme Court dismissed the petition on the ground "that animals are not 'persons' entitled to rights and protections afforded by the writ of habeas corpus" and, in any event, habeas relief is not available where, as here, petitioner merely sought to obtain Happy's transfer from one lawful confinement to another rather than her immediate release from

detention. On petitioner's appeal, the Appellate Division unanimously affirmed, reasoning that "the writ of habeas corpus is limited to human beings" (189 AD3d 583, 583 [1st Dept 2020]). The Appellate Division also cautioned that a judicial determination that nonhuman animals are legal "persons" would "lead to a labyrinth of questions that common-law processes are ill-equipped to answer," noting that "the decisions of whether and how to integrate other species into legal constructs designed for humans is a matter better suited to the legislative process" (*id.* [citation omitted]). This Court granted petitioner leave to appeal (36 NY3d 912 [2021]).

## II.

Petitioner urges the Court to recognize Happy as a legal "person" with a common law right to bodily liberty subject to the protections of the writ of habeas corpus. According to petitioner, modern ethics, policy, notions of justice, and social norms compel the conclusion that Happy has the right to be free from confinement in the Zoo because she is an autonomous and extraordinarily cognitively complex being capable of possessing legal rights even if she is incapable of assuming legal duties. While no one disputes the impressive capabilities of elephants, we reject petitioner's arguments that it is entitled to seek the remedy of habeas corpus on Happy's behalf. Habeas corpus is a procedural vehicle intended to secure the liberty rights of human beings who are unlawfully restrained, not nonhuman animals.

The ancient writ of habeas corpus "is a summary proceeding to secure personal liberty" that "strikes at unlawful imprisonment or restraint of the person by state or citizen" (*People ex rel. Duryee v Duryee*, 188 NY 440, 445 [1907]; *see People ex rel. Sabatino v*

*Jennings*, 246 NY 258, 260 [1927]).  The right of persons to invoke the writ of habeas corpus—"the historic writ of liberty" which we have recognized as "the greatest of all writs"—is "primary and fundamental" (*People v Schildhaus*, 8 NY2d 33, 36 [1960] [internal quotation marks omitted]; *see* US Const, art I, § 9; NY Const, art I, § 4; *People ex rel. DeLia v Munsey*, 26 NY3d 124, 130 [2015]).  The centuries-old writ originated in English law and has been a steadfast pillar of our common law (*see Preiser v Rodriguez*, 411 US 475, 484-485 [1973]; *People ex rel. Tweed v Liscomb*, 60 NY 559, 565-566 [1875]).  It is also enshrined in the New York Constitution, which safeguards "[t]he right of persons, deprived of liberty, to challenge in the courts the *legality* of their detention" (*Hoff v State of New York*, 279 NY 490, 492 [1939] [emphasis added]).  Article I, § 6 declares that "[n]o person shall be deprived of life, liberty or property without due process of law" and Article I, § 4 dictates that the privilege of the writ of habeas "shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it."  Thus, although procedural aspects of the writ are governed by statute (*see* CPLR art 70), the "writ cannot be abrogated, or its efficiency curtailed, by legislative action" (*Tweed*, 60 NY at 566).

"Our constitutional guaranties of liberty are merely empty words unless a person imprisoned or detained against [their] will may challenge the legality of [their] imprisonment and detention" (*Hoff*, 279 NY at 492).  The common law writ of habeas corpus therefore provides a means of redress for persons alleging detention or imprisonment in violation of various statutory or constitutional rights and, on the merits, the question presented in a habeas proceeding is whether the relator's confinement is

contrary to law (*see DeLia*, 26 NY3d at 130-131; *People ex rel. Thorpe v Von Holden*, 63 NY2d 546, 550 [1984]; *People ex rel. Spinks v Harris*, 53 NY2d 784, 785 [1981]; *People ex rel. Klein v Krueger*, 25 NY2d 497, 499 [1969]; *People ex rel. Zakrzewski v Mancusi*, 22 NY2d 400, 404-405 [1968]; *People ex rel. Granskofski v Whitehead*, 8 NY2d 962, 963 [1960]; *Sabatino*, 246 NY at 260; *Lemmon v People*, 20 NY 562, 615 [1860]).  Persons seeking a writ of habeas corpus must establish more than just confinement to justify its issuance; they must show that their confinement is illegal (*see People ex rel. Robertson v New York State Div. of Parole*, 67 NY2d 197, 201 [1986]; *see also* CPLR 7003 [a]).  Habeas corpus is not, however, the primary remedy for statutory or constitutional violations that result in unlawful restraint.  Resort to habeas and "[d]eparture from traditional orderly proceedings"—such as the appellate process—is "permitted only when dictated . . . by reason of practicality and necessity" (*People ex rel. Keitt v McMann*, 18 NY2d 257, 262 [1966]).  Furthermore, under New York law, "habeas corpus generally will lie only where the [relator] would become entitled to . . . immediate release upon the writ being sustained" (*People ex rel. Chakwin v Warden, N.Y. City Correctional Facility, Rikers Is.*, 63 NY2d 120, 125 [1984]; *see DeLia*, 26 NY3d at 131; *People ex rel. Hall v LeFevre*, 60 NY2d 579, 580 [1983]; *People ex rel. Mendolia v Superintendent., Green Haven Correctional Facility*, 47 NY2d 779, 779 [1979]).

Petitioner urges this Court to recognize its right on behalf of Happy, an elephant, to invoke the protections of the writ to challenge her confinement at the Bronx Zoo.  However, despite the awesome power of the writ of habeas corpus and its enduring use throughout the centuries, no court of this State—or any other—has ever held the writ applicable to a

nonhuman animal. Nothing in our precedent or, in fact, that of any other state or federal court, provides support for the notion that the writ of habeas corpus is or should be applicable to nonhuman animals. The selective capacity for autonomy, intelligence, and emotion of a particular nonhuman animal species is not a determinative factor in whether the writ is available as such factors are not what makes a person detained qualified to seek the writ. Rather, the great writ protects the right to liberty of humans *because* they are humans with certain fundamental liberty rights recognized by law (*see generally Preiser*, 411 US at 485; *Tweed*, 60 NY at 569; *Sisquoc Ranch Co. v Roth*, 153 F2d 437, 440-441 [9th Cir 1946]). Nonhuman animals are not, and never have been, considered "persons" with a right to "liberty" under New York law (*see* ECL 11-0105 ["The State of New York owns all fish, game, wildlife, shellfish, crustacea and protected insects in the state, except those legally acquired and held in private ownership"]; *Mullaly v People*, 86 NY 365, 366-368 [1881]; *Pierson v Post*, 3 Caines 175, 178-179 [1805]; *see* Agriculture and Markets Law §§ 108, 107).

To be sure, as our dissenting colleagues observe, the writ of habeas corpus is flexible and has long existed as a mechanism to secure recognition of the liberty interests of *human beings*—even those whose rights had not yet been properly acknowledged through established law. That flexibility, however, is not limitless and the extension of the writ would far exceed its bounds here, where petitioner seeks its application to a nonhuman animal. In that regard, the dissents are long on historical discourse but woefully short of any cogent legal analysis identifying any recognizable source of a proclaimed liberty right or so-called fundamental right to be free that they seek to bestow upon autonomous

nonhuman animals. Instead, the dissenters conclude that the logical progression of our common law runs from extending habeas to "abused women and children and enslaved persons" (Wilson, J., dissenting op at 70, 16-36, *see also* Rivera, J. dissenting op at 5-9) to granting an elephant the right to bring a habeas proceeding, an odious comparison with concerning implications—as both dissenters acknowledge but one on which they nevertheless rely. We are unpersuaded.

At bottom, even petitioner implicitly concedes that Happy is not guaranteed freedom from captivity—the right to liberty—under the law. The relief requested is not discharge from confinement altogether but, rather, a transfer of Happy from one confinement to another of slightly different form—an implicit acknowledgement that Happy, as a nonhuman animal, does not have a legally cognizable right to be at liberty under New York law. The fact that the greatest relief which could be afforded Happy is a transfer between lawful confinements demonstrates the incompatibility of habeas relief in the nonhuman context inasmuch as, under New York law, the writ may be sustained only when a person is entitled to immediate release from an unlawful restraint of liberty (*see Chakwin*, 63 NY2d at 125; *compare People ex rel. Brown v Johnston*, 9 NY2d 482, 485 [1961] *with People ex rel. Dawson v Smith*, 69 NY2d 689, 691 [1986]).

Significantly, courts have consistently determined that rights and responsibilities associated with legal personhood cannot be bestowed on nonhuman animals (*see Lavery*, 152 AD3d at 78; *Lavery*, 124 AD3d at 152; *Rowley*, 99 Mass App Ct 1104, *2; *R.W. Commerford and Sons, Inc.*, 192 Conn App at 45-46*; cf. Tilikum ex rel. People for the Ethical Treatment of Animals, Inc. v Sea World Parks & Entertainment, Inc.*, 842 F Supp

2d 1259, 1263 [SD Cal 2012]; *Lewis v Burger King*, 344 Fed Appx 470, 472 [10th Cir 2009]; *Cetacean Community v Bush*, 386 F3d 1169, 1177-1178 [9th Cir 2004]; *Citizens to End Animal Suffering and Exploitation, Inc. v New England Aquarium*, 836 F Supp 45, 49 [D Mass 1993]; *Miles v City Council of Augusta, Ga.*, 710 F2d 1542, 1544 n 5 [11th Cir 1983]).  As these courts have aptly observed, legal personhood is often connected with the capacity, not just to benefit from the provision of legal rights, but also to assume legal duties and social responsibilities (*see R.W. Commerford and Sons, Inc.*, 192 Conn App at 46; *Lavery*, 152 AD3d at 78; *Lavery*, 124 AD3d at 151; Black's Law Dictionary [11th ed 2019], person).  Unlike the human species, which has the capacity to accept social responsibilities and legal duties, nonhuman animals cannot—neither individually nor collectively—be held legally accountable or required to fulfill obligations imposed by law.

Nor does any recognition of corporate and partnership entities as legal "persons" lend support to petitioner's claim.  Corporations are simply legal constructs through which human beings act (*see Pembina Consol. Silver Mining & Milling Co. v Pennsylvania*, 125 US 181, 189 [1888]) and corporate entities, unlike nonhuman animals, bear legal duties in exchange for legal rights.  Moreover, although corporations are deemed "persons" in some legal contexts, courts have nonetheless recognized that corporate entities—which cannot be held in custody—do not have liberty interests subject to the remedy of habeas corpus (*see United States v Mett*, 65 F3d 1531, 1533 [9th Cir 1995]; *United States v Pacific Ship Repair & Fabricators, Inc.*, 979 F2d 856, * 2 [9th Cir 1992]; *Waste Mgt. of Wisconsin, Inc. v Fokakis*, 614 F2d 138, 140-141 [7th Cir 1980]).  Thus, any comparison between nonhuman animals and corporations for these purposes is inapt and unavailing.

Petitioner and our dissenting colleagues minimize the significance of petitioner's request that Happy be declared a legal person with a right to liberty safeguarded by the writ of habeas, maintaining that affording such a remedy merely seeks to establish one right for Happy that would allow her to live her remaining years in captivity but in a more natural environment. To that end, petitioner asserts that any concerns raised by respondents or the opposing amici regarding the potential proliferation of nonhuman animal claims on behalf of elephants or other species are irrelevant to our determination today.

We cannot agree; to do so would be to turn a blind eye to the impact of any ruling that elephants (or autonomous beings more generally) have liberty interests. A determination that Happy, an elephant, may invoke habeas corpus to challenge her confinement at the Bronx Zoo—a confinement both authorized and, by all indications, compliant with state and federal statutory law and regulations—would have an enormous destabilizing impact on modern society. It is not this Court's role to make such a determination. As the Appellate Court of Connecticut cautioned in dismissing similar litigation by petitioner in that state, "[n]ot only would this case require us to recognize elephants as 'persons' for purposes of habeas corpus, this recognition essentially would require us to upend this state's legal system to allow highly intelligent, if not all, nonhuman animals the right to bring suit in a court of law" (*R.W. Commerford and Sons, Inc.*, 192 Conn App at 44). Granting legal personhood to a nonhuman animal in such a manner would have significant implications for the interactions of humans and animals in all facets of life, including risking the disruption of property rights, the agricultural industry (among others), and medical research efforts. Indeed, followed to its logical conclusion, such a

determination would call into question the very premises underlying pet ownership, the use of service animals, and the enlistment of animals in other forms of work. With no clear standard for determining which species are entitled to access the writ, who has standing to bring such claims on a nonhuman animal's behalf, what parameters to apply in determining whether a confinement is "unjust," and whether "release" from a confinement otherwise authorized by law is feasible or warranted in any particular case, courts would face grave difficulty resolving the inevitable flood of petitions. Likewise, owners of numerous nonhuman animal species—farmers, pet owners, military and police forces, researchers, and zoos, to name just a few—would be forced to answer and defend those actions.

Tellingly, neither of our dissenting colleagues identify any intelligible standard upon which to resolve these labyrinthine issues, which buttresses our conclusion that habeas corpus—which exists to protect liberty interests—is not the appropriate forum to resolve disputes concerning the confinement of nonhuman animals. Judge Wilson posits that courts should engage in "a normative analysis that weighs the value of keeping the [nonhuman animal] confined with the value of releasing the [nonhuman animal] from confinement," taking into consideration "[t]he value of the confinement" to the nonhuman animal as well as the "value of the confinement to the captor and society" (Wilson, J. dissenting op at 68). This, of course, bears no relationship to the merits analysis properly undertaken in a habeas corpus proceeding, which asks whether the confinement—i.e., the curtailment of liberty—is legal. Rather, relief would be dependent, not on the legality of detention, but on a judge's subjective determination of where the relator would be "better off" (Wilson, J. dissenting op at 4). Such a balancing test would transform the great writ

of habeas into a morass of confusing case-by-case inquiries apparently to be determined by some subjective, amorphous, and evolving "normative" value system regarding the treatment of nonhuman animals to which our own legislature has not subscribed. Moreover, a standard weighing the nonhuman animal's purported liberty interests against the various interests of the claimed human captor does little to alleviate the asserted wrongful subjugation of nonhuman animals. Judge Rivera, on the other hand, suggests that liberty rights spring from "autonomy"—a term that is notably left undefined and which could reasonably be applied to a vast number of species.

Judge Wilson also appears to contemplate some form of "functional intelligence" test to limit the undeniably slippery slope his view would set us upon. But that is exactly the test, as Judge Wilson himself makes clear (*see* Wilson, J. dissenting op at 14-15), that cannot be used for human animals. All one can glean from Judge Wilson's dissent is that elephants qualify, ants do not. What of dolphins—or dogs? What about cows or pigs or chickens—species routinely confined in conditions far more restrictive than the elephant enclosure at the Bronx Zoo? Indeed, the dissenters' wholly unsatisfactory attempts to distinguish "domestic" animals from elephants despite their appreciable intelligence and autonomy simply because they purportedly live "comfortably" among humans (Rivera, J. dissenting op at 19) or are supposedly genetically predisposed to confinement (*see* Wilson, J. dissenting op at 62-64) is divorced from practical reality, devoid of support, and demonstrates the internally contradictory foundation on which their analyses are built. Such arbitrary distinctions stand in clear contrast to our recognition that habeas is, and always has been, the bulwark of *human* liberty rights. Moreover, giving a court authority

to interpret the relevant "science" (Wilson, J. dissenting op at 59-65) so as to make judgments regarding "who" deserves a right to "liberty" would have perilous implications far beyond the issue here.

Simply put, granting legal personhood and attendant liberty rights to Happy, an elephant, would not be an incremental step in "the slow process of decisional accretion" regarding the scope and flexibility of the writ of habeas (*Keitt*, 18 NY2d at 263) but a "sweeping pronouncement[]" of nonhuman animal personhood lacking in legal foundation that would displace the carefully devised state and federal statutory frameworks governing animal welfare (*R.W. Commerford and Sons, Inc*., 192 Conn App at 44).  Thus, while this litigation may invite consideration by others of questions that are the appropriate subject of ethical, moral, religious, and philosophical debate, the legal issue presented is straightforward.  The use of habeas corpus as a vehicle to extend legal personhood beyond living humans is not a matter for the courts (*see Byrn v New York City Health & Hosps. Corp.*, 31 NY2d 194, 203 [1972]).

Although nonhuman animals are not "persons" to whom the writ of habeas corpus applies, the law already recognizes that they are not the equivalent of "things" or "objects." Unquestionably, nonhuman animals are sentient beings that, albeit without liberty rights, have been afforded many special protections by the New York Legislature—long considered a leader in animal welfare.  For example, statutes prohibit and penalize the torture, unjustifiable killing or harming, fighting, neglect, or abandonment of animals (*see* Agriculture and Markets Law §§ 351, 353, 353-a, 355, 356).  Recently enacted legislation requires veterinarians to report suspected animal cruelty (*see* Education Law § 6714).

Various statutes mandate minimum safety and welfare standards, or prohibit conduct commonly known to be harmful to animals (*see* Agriculture and Markets Law §§ 47, 353-b, 353-d, 353-f, 360, 362, 365, 368, 381).  New York regulates the sale and care of certain animals by pet dealers (*see* Agriculture and Markets Law §§ 354, 401) and the interference with, and keeping of, wild animals, including endangered species (*see* ECL 11–0103 [6] [e]; 11-0505; 11-0535; 11-0511; 11–0512).[1]  In addition to animal welfare laws, New York permits the creation of a trust for the care of a designated domestic or pet animal (*see* EPTL 7-8.1) and courts may now consider the best interests of companion animals in determining the appropriate placement of an animal during a divorce proceeding (*see* Domestic Relations Law § 236, pt B, [5] [d] [15]).  With respect to elephants specifically, New York largely prohibits and penalizes the sale and import of ivory articles (*see* ECL §§ 11-0535-a; 71-0924) and, in recognition that the state "should help assure the protection and welfare of elephants" (L 2017, ch 333 § 2), New York has prohibited "person[s]" other than those involved with accredited zoos and wildlife sanctuaries from using elephants in entertainment acts (Agriculture and Markets Law § 380; *see* ECL 11-0540).

As the foregoing statutes demonstrate, New York law acknowledges that the relationships between humans and nonhuman animals are varied and complex and, in many contexts, the law clearly imposes a duty on humans to treat nonhuman animals with dignity and respect.  However, also implicit in these statutes is a plain endorsement of the legal

---

[1] The federal Animal Welfare Act likewise regulates the treatment of animals in research, testing, transport, exhibition, and sale (*see generally* 7 USC § 2131 *et seq.*) and various federal laws codify protections for wildlife (*see e.g.* 16 USC § 1531 *et seq.* [the Endangered Species Act]; 16 USC § 703 *et seq.* [Migratory Bird Treaty]).

distinction between human beings and nonhuman animals (*see* Agriculture and Markets Law § 350 [defining "animal" as including "every living creature except a human being"]; Agriculture and Markets Law § 380 [distinguishing between "person(s)" and "elephants"]). While it is true that the courts—not the legislature—ultimately define the scope of the common law writ of habeas corpus (*see Sabatino*, 246 NY at 261; *Tweed*, 60 NY at 566), these statutory distinctions reflect the abiding view that nonhuman animals are not persons with a common law right to liberty that may be secured through a writ of habeas corpus.[2]

We close with the observation that, despite the relative simplicity of the legal issue presented, this case has garnered extraordinary interest from amici curiae and the public— a testament to the complicated and ever-evolving relationship between human beings and other animals. Though beyond the purview of the courts, we appreciate that the desire and ability of our community to engage in a continuing dialogue regarding the protection and welfare of nonhuman animals is an essential characteristic of our humanity. Such dialogue, however, should be directed to the legislature.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

---

[2] That legislative bodies have extended various statutory protections to nonhuman animals does not inexorably create a common law or constitutional right to liberty. Nor can the judicial displacement of a carefully crafted state and federal statutory and regulatory legal framework governing animal care be justified by the views of some individuals that zoos purportedly confine wild animals solely for "human entertainment" (Rivera, J. dissenting op at 4)—a characterization of the purpose and mission of zoos to which the Bronx Zoo, operated by a renowned wildlife organization that advances scientific research and educational conservation efforts worldwide, would undoubtedly strenuously object.

WILSON, J. (dissenting):

The Wildlife Conservation Society, formerly known as the New York Zoological Society, has operated the Bronx Zoo for well over a century. In 1906, it placed Ota Benga, a member of the Mbuti people, on display in the Zoo's monkey house, behind iron bars.

Two years earlier, Samuel Verner, a South Carolinian white supremacist, had been hired

to remove some so-called "pygmies" from what was then the Belgian Congo, for exhibition

at the St. Louis World's Fair.  Mr. Benga and eight others were exhibited there, after which

Mr. Verner transferred Mr. Benga to the Zoo for exhibition.  The Zoo's attendance doubled;

nearly a quarter of a million people came to the Zoo to view Mr. Benga.  The New York

Times reported that Mr. Benga was "one of a race that scientists do not rate high in the

human scale" (NY Times, *Bushman Shares a Cage with Bronx Park Apes*, Sept. 9, 1906 at

17).  When protests by African American ministers, led by the Reverend Dr. Robert Stuart

MacArthur, forced his release, the Zoo's director, William Hornaday, wrote to New York

Mayor George McClellan, explaining that the exhibition of Mr. Benga in the monkey house

was "good comic-opera material" and that the ministers "are seeking newspaper notoriety,

rather than the redress of a real grievance" (Letter from William T. Hornaday to Mayor

George       B.       McClellan,       Sept.       12,       1906,       available       at

https://wcs.access.preservica.com/uncategorized/IO_d20af6d6-8f81-4a58-b90c-

1a9f7b4662f1/).[1]  Mr. Benga never was returned home; he shot himself in the heart several

years later.  During the pendency of this lawsuit, the Zoo apologized for its treatment of

Mr. Benga, and made its records concerning him publicly available for the first time.

Reverend MacArthur tellingly observed: "The person responsible for this exhibition

---

[1] Mayor McClellan declined to meet with the ministers, directing them to take their complaints to the Zoological Society's founder and secretary, Madison Grant, the author of a book entitled *The Passing of the Great Race*, "which advocated cleansing America of 'inferior races' through birth control, antimiscegenation and racial segregation laws, and mass sterilization" (Pamela Newkirk, Spectacle: The Astonishing Life of Ota Benga 43 [2015]).

degrades himself as much as he does the African" (NY Times, *Man and Monkey Show Disapproved by Clergy*, Sept. 10, 1906 at 1).

That same Zoo has confined Happy the elephant for the past 40 years. Unquestionably, Mr. Benga was a human being; Happy is not. Human beings should have greater rights than elephants, if only because we make the rules. The crucial point from both Mr. Benga's and Happy's confinement, though, is that both suffered greatly from confinement that, though not in violation of any statutory law, produced little or no social benefit. As Jeremy Bentham wrote several centuries ago:

> "The day has been, I grieve to say in many places it is not yet past, in which the greater part of the species, under the denomination of slaves, have been treated by the law exactly upon the same footing as, in England for example, the inferior races of animals are still. The day *may* come, when the rest of the animal creation may acquire those rights which never could have been withholden from them but by the hand of tyranny. . . . It may come one day to be recognized, that the number of legs, the villosity of the skin, or the termination of the *os sacrum*, are reasons equally insufficient for abandoning a sensitive being to the same fate. What else is it that should trace the insuperable line? . . . [T]he question is not, Can they *reason*? nor, Can they *talk*? but *Can they suffer*?" (Jeremy Bentham, An Introduction to the Principles of Morals and Legislation 311 n1 [Oxford, Clarendon Press 1781] [emphasis in original]).

They can and do, and that day is upon us.

The majority pays lip service to Happy's intelligence, her undisputed existence as "an autonomous and extraordinarily cognitively complex being" and legal entitlement to "dignity and respect" (majority op, at 6, 16). It likewise trumpets the role of habeas corpus as "the historic writ of liberty" that is "primary and fundamental" (*id.* at 7). Yet the

majority devalues both in its attempt to mis-frame the question presented. The majority erroneously claims that "the writ of habeas corpus is intended to protect the liberty right of *human beings*," and that habeas corpus is unavailable to Happy as a matter of law because she is "not a 'person' subjected to illegal detention" (*id.* at 2), though knowing full well that the writ was vigorously used to challenge the detention of slaves when, under law, they were deemed chattel, and to challenge the detention of women and children who at that time, though not chattel property, had no legal existence.

The question here is not whether Happy is a "person"—Happy is an elephant. The question is not whether Happy's detention violates some statute: historically, the Great Writ of habeas corpus was used to challenge detentions that violated no statutory right and were otherwise legal but, in a given case, unjust. Because this appeal comes on a motion to dismiss, the legal question presented is whether the detention of an elephant can ever be so cruel, so antithetical to the essence of an elephant, that the writ of habeas corpus should be made available under the common law. The history of the "'greatest of all writs'" (*id.* at 7, quoting *People v Schildhaus*, 8 NY2d 33, 36 [1960]) demonstrates that the majority's claimed reasons for refusing to extend it to Happy are groundless and inconsistent with its role as "the historic writ of liberty" that "cannot be curtailed by legislative action" (*id.*, quoting *Tweed v Liscomb*, 60 NY 559, 566 [1875]). Whether Happy's conditions are grave enough for the writ to issue, and whether, if so, she would be better off in a sanctuary, are questions of fact as to which Supreme Court made no determination because it was constrained by erroneous Appellate Division caselaw.

There are several propositions on which the majority and I agree.  The purpose of the Great Writ is to secure liberty.  The writ "originated in English law and has been a steadfast pillar of our common law" (*id.* at 7, citing *Preiser v Rodriguez*, 411 US 475, 485 [1973]).  The writ reaches both public and private detentions (*id*. at 6).  The writ is used only when "reason[s] of practicality and necessity" require it (*id.* at 8, quoting *People ex rel. Keitt v McMann*, 18 NY2d 257, 262 [1966]).  Article 70 of the CPLR does not (and cannot) curtail the substance or reach of the writ; it specifies procedure only.

The majority offers numerous justifications for its conclusion that the writ must be limited to humans, no matter how sophisticated, intelligent, self-aware or capable of suffering an elephant is and no matter how severe the conditions of its confinement are.  I proceed as follows: (I) whether an elephant is a "person" or whether it can bear responsibilities are irrelevant questions that obfuscate the genuine question presented; (II) the history of the Great Writ demonstrates that courts have used and should use it to enhance liberty when a captivity is unjust, even when the captor has statutory or common law rights authorizing such captivities in general; (III) as with our society's changed understanding of the rights of enslaved persons, women and children, our understanding of the cognitive and emotional makeup, needs and capabilities of elephants is far different than it was in bygone times; (IV) the method by which courts modify the common law to adapt it to societal changes and needs informs our Court's role in adapting the Great Writ; and (V) application of the above principles to Happy's petition justifies use of the writ to

examine whether her interest in liberty outweighs the Zoo's interest in her continued captivity.

## I

Two contentions, one irrelevant and one to which the majority and lower courts have offered an unsupportable answer, sow great confusion about the question raised by this appeal. The first, irrelevant, contention is that an elephant is not a "person." The second, unsupportable, contention is that only humans can have rights.

## A

Whether an elephant (or other animal) is a "person" is not relevant to determining whether the writ of habeas corpus can be used to challenge a confinement. All can agree that an elephant is not a member of the *homo sapiens* species. At the same time, an elephant is not a desk chair or an earthworm; the majority, echoing Judge Fahey's concurrence in *Matter of Nonhuman Rights Project, Inc. v Lavery* (31 NY3d 1054 [2018]), offers that animals are not "the equivalent of 'things' or 'objects'" (majority op at 15). So the correct question becomes: given what we know about the qualities an elephant has—and in particular, the qualities Happy has—should the law afford her certain rights through habeas corpus?

The idea that the definition of "person" constrains the allocation of rights arises from three different ideas: (1) CPLR article 70, which concerns writs of habeas corpus, uses the word "person"; (2) a combination of the facts that prior habeas cases concerned human beings and animals have been considered property inexorably results in the

conclusion that habeas corpus cannot reach animals; and (3) the relevant rights, if any, are

the rights of the subject of the confinement.  The first two ideas have been conflated when

they should not be, and the third has been implied without any examination of its

soundness.  I discuss each in turn.

1

CPLR 7002 provides, in relevant part:

> "A *person* illegally imprisoned or otherwise restrained in his
> liberty within the state . . . may petition without notice for a
> writ of habeas corpus . . . .  A judge . . . having evidence, in a
> judicial proceeding before him, that any *person* is so detained
> shall . . . issue a writ of habeas corpus for the relief of that
> person" (emphasis added).

Although the court in *Matter of Nonhuman Rights Project, Inc. v Lavery* (152 AD3d

73, 77 [1st Dept 2017]) concluded that the use of the word "person" in the CPLR served to

restrict the writ to human beings, the court in *People ex rel. Nonhuman Rights Project, Inc.*

*v. Lavery* (124 AD3d 148 [3rd Dept 2014]) held to the contrary:

> "The 'Legislature did not intend to change the instances in
> which the writ was available,' which has been determined by
> 'the slow process of decisional accretion' (*People ex rel. Keitt
> v McMann*, 18 NY2d 257, 263, 220 NE2d 653, 273 NYS2d
> 897 [1966]) [citation omitted]).  Thus, we must look to the
> common law surrounding the historic writ of habeas corpus to
> ascertain the breadth of the writ's reach" (*id.* at 150).

The majority correctly adopts part of the holding of the Third Department, by recognizing

that "although procedural aspects of the writ are governed by statute (*see* CPLR art 70),

the 'writ cannot be abrogated, or its efficiency curtailed, by legislative action' ( *Tweed*, 60

NY at 566)" (majority op at 7). It does so for good reason: as we have previously explained, "[a]lthough article 70 governs the procedure of the common-law writ of habeas corpus, relief from illegal imprisonment by means of this remedial writ is not the creature of any statute" (*People ex rel. DeLia v Munsey*, 26 NY3d 124, 130 [2015]).

Furthermore, the legislative history of article 70 demonstrates that the use of the word "person" was meant to have no substantive component: "The drafters of the CPLR made no attempt to specify the circumstances in which habeas corpus is a proper remedy. This was viewed as a matter of substantive law" (Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, CPLR 7001). Just as "person" is used in a juridical sense to refer to any entity, real or fictional, as to which a statute or rule of the common law applies, "person" in CPLR article 70 is irrelevant to whether the writ can extend beyond humans. Thus, the majority and I agree that article 70 has no bearing on whether Happy may invoke the writ of habeas corpus to challenge her confinement.

2

In an attempt to prove that "the great writ protects the right to liberty of humans *because* they are humans," the majority links several incongruous citations: three cases that contain no such holding; a statute declaring that New York owns all animals except those privately held; another statute concerning dog ownership; and two cases from the 1800s concerning animal ownership (majority op at 9 [emphasis in majority]). *Preiser*, *Tweed* and *Sisquoc Ranch* did not involve any claim on behalf of animals, and the generic language in them (*e.g.*, "the writ is a remedy 'by which a *man* is restored' to liberty"

[*Preiser v Rodriguez*, 411 US 475, 486 (1973)]; "the law 'suffers to *man*, guilty or innocent, to be deprived of his liberty'" [*Tweed v Liscomb*, 60 NY 559, 568 (1875)]) no more excludes animals that it does women or children.[2]  The final case cited by the majority, *Sisquoc Ranch Co. v Roth* (153 F 2d 437 [9th Cir 1946]) held that under federal (statutory)[3] habeas, an agricultural employer, asserting injury to itself from the military conscription of one of its employees, "is without standing to maintain this proceeding" (*id.* at 440).

As to the majority's citation to statutes providing for ownership of animals, no one doubts that animals can be owned, but ownership does not prevent the application of habeas corpus to the owned subject, as is demonstrated in section II below, and not substantially challenged by the majority.  Finally, the remaining cases cited by the majority (*Mullaly v*

---

[2] *Preiser* undercuts a different proposition of the majority's—that confinement must be unlawful to permit invocation of the Great Writ:  "By the time the American Colonies achieved independence, the use of habeas corpus to secure release from unlawful physical confinement, whether judicially imposed or not, was thus an integral part of our common-law heritage. . . . [O]ver the years, the writ of habeas corpus evolved as a remedy available to effect discharge from any confinement contrary to the Constitution *or fundamental law, even though imposed pursuant to conviction by a court of competent jurisdiction*" (411 US at 485 [emphasis added]).  *Tweed*, like *Preiser*, undercuts the majority's restrictive application of the Great Writ:

> "Neither should the habeas corpus act, which judges have 'revered as the bulwark of the Constitution, the magna charta of personal rights,' be shorn of its power and its glory by a subtle and metaphysical interpretation; rather should it receive a liberal construction, in harmony with its grand purpose, and in disregard, if need be, of technical language used.  This act has always been construed in favor of, and not against, the liberty of the subject and the citizen" (60 NY at 568-569).

[3] The power of federal courts to issue writs of habeas corpus is not grounded in the common law, but is purely statutory (*Ex Parte Bollman*, 8 US [4 Cranch] 75 [1807]).  Accordingly, federal decisions applying a more restrictive view of habeas corpus have no bearing on the powers of common law courts such as ours.

*People*, 86 NY 365 [1881] and *Pierson v Post*, 3 Cai R 175 [NY Sup Ct 1805]), establish (irrelevantly) that animals can be owned, but sharply undermine the majority's position. Our decision in *Mullaly* noted that "[a]t common law the crime of larceny could not be committed by feloniously taking and carrying away a dog," but then wiped out that common law rule on the ground that "[t]he artificial reasoning upon which these rules were based are wholly inapplicable to modern society. *Tempora mutantur et leges mutantur in illis* [Times change and the laws change with them]" (86 NY at 86 [emphasis in original]). That proposition is at the core of my dissent. In the famous case of *Pierson v Post*, the Supreme Court of Judicature (our predecessor) twice noted that wild animals ("*ferae naturae*") have "natural liberty" (3 Cai R at 178, 179)—a conclusion diametrically opposed to the majority's view that only human beings have natural liberty rights.

What is patent from the glommed-together authorities is that they do not prove anything relevant here. Cases that do not raise an issue cannot be taken to resolve something never at issue. Statutes or cases allowing that humans may own animals do not establish that owned beings can have no justiciable rights. The question here is not governed by any prior decision: it is novel. The novelty of an issue does not doom it to failure: a novel habeas case freed an enslaved person; a novel habeas case removed a woman from the subjugation of her husband; a novel habeas case removed a child from her father's presumptive dominion and transferred her to the custody of another (*see infra* section II). More broadly, novel common law cases—of which habeas is a subset—have advanced the law in countless areas (*see infra* section IV). The majority's argument—"this

has never been done before"—is an argument against all progress, one that flies in the face of legal history. The correct approach is not to say, "this has never been done" and then quit, but to ask, "should this now be done even though it hasn't before, and why?"

3

A third source of confusion arises from an unstated misconception about rights. Rights are interdependent on reciprocal rights. We tend to ask whether someone has a right to free speech, or to a jury trial or to privacy in one's home. But each of those implies reciprocal rights—corresponding or even inverse rights that members of society have against that person, for example: the right to be free from libelous speech; the right to convict someone based on a jury's determination of guilt; and the right to search a home by obtaining a warrant. In Happy's case, the value of liberty to Happy, however weak or strong it is, animates Happy's right to liberty, but that right is also affected by its reciprocal: the right of the Zoo to confine Happy in the manner it has chosen, however weak or strong that interest is. In the end, whatever right we define concerns not merely Happy's interest in liberty, but the Zoo's interest in Happy's captivity. Importantly, the choice in fixing that right affects Happy and the Zoo, but also defines who we are or, in the case of habeas, who we might want to be as a society. For that reason as well, it does not matter that Happy is an elephant. Were a court to determine that the Zoo cannot confine her, that determination would not merely define Happy's rights, but the rights of the human captors as well.

B

The majority and the prior decisions in the Appellate Division's *Lavery* cases (152 AD3d 73; 124 AD3d 148) adopt the proposition that animals cannot have rights because they cannot bear responsibilities.[4]  That proposition, apparently based vaguely on social contract theory,[5] confuses who can confer rights with who can hold rights.  Elephants cannot confer rights on humans, but humans can—and do—confer rights on animals in abundance.

---

[4] It is not even clear what is meant by "bearing responsibilities."  An estimated 70% of Americans have committed a jailable offense, suggesting humans at least in our country routinely renege on responsibilities society imposes on them (Stephen L. Carter, *Law Puts us All in Same Danger as Eric Garner*, Bloomberg, Dec. 4, 2014, available at https://www.bloomberg.com/opinion/articles/2014-12-04/law-puts-us-all-in-same-danger-as-eric-garner#xj4y7vzkg).  Meanwhile, stories of heroically responsible animals—trained or not—abound (*see, e.g.*, Melissa Chan, *National Puppy Day 2017: Here Are 5 Brave Dogs That Saved a Child's Life*, Time, Mar. 22, 2017, available at https://time.com/4709801/national-puppy-day-2017-dogs-save-children/).  Dogs are regularly put to work defending livestock, people and property; working for law enforcement; and detecting various types of cancers in humans.  The Navy has trained dolphins and sea lions to protect sailors and Marines (Naval Information Warfare Center – Pacific, *U.S. Navy Marine Mammal Program*, available at https://www.niwcpacific.navy.mil/marine-mammal-program/ [accessed June 9, 2022]).  Happy, who could trample her caretakers, is responsible enough to know not to hurt them.  Elephants take care of their extended families much as human families do—perhaps better.  Thus, even the concept of "bearing responsibilities" imposes a human-centric idea of what it means to be responsible for others or one's own actions, and humans themselves may often fall below that standard of responsibility.

[5] Social contract theory begins with the premise that a broad set of freedoms exist in the state of nature, and participants in the (theoretical) social contract agree to give up some of those freedoms in exchange for the benefits of government and civilization.  It is a tortuous (though not impassible) route to conclude that the social contract grants rights by cutting back at those rights that existed in the state of nature.

It helps to start by understanding what a right consists of.  A right consists of a sphere of action protected from intrusion by others: "[d]uty and right are correlative; and where a duty is imposed, there must be a right to have it performed" (*Amberg v Kinley*, 214 NY 531, 535 [1915], quoting *Willy v Mulledy*, 78 NY 310 [1879]).  "In other words, if X has a right against Y that he shall stay off the former's land, the correlative (and equivalent) is that Y is under a duty toward X to stay off the place" (Wesley Newcomb Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L J 16, 30-32 [1913]).

But the holder of a right need not have a duty at all.  Humans can create a legal system that confers rights on animals even if animals cannot bear duties, and even if animals are unaware of the rights they have been granted.  "Animals have many legal rights, protected under both federal and state laws.  In some instances, criminal statutes punish those who violate statutory duties that protect animals" (*Cetacean Community v Bush*, 386 F 3d 1169, 1175 [9th Cir 2004]).  Humans have granted animals countless rights without imposing any duties on them or even considering whether they are capable of bearing duties.  For example, 16 USC § 668 imposes a duty on humans not to capture or kill a bald or golden eagle, enforced by fines and imprisonment; that duty establishes a correlative right of bald and golden eagles to be free from capture by humans (except as authorized by permit).  The Endangered Species Act (16 USC § 1531 et seq.) gives all animals falling within its purview the right not to be captured, harassed or harmed by humans, and imposes a correlative duty on humans.

Indeed, the very legislation the majority lists provides numerous rights to animals, including the right not to be tortured, killed unjustifiably, abandoned or neglected; the right to have medical providers report suspected cases of abuse; the right of domestic animals to have trusts made in their behalf enforced by courts; and the right to have their best interests considered when those with legal custody over them are divorcing (majority op at 15-16). Notably, those rights parallel rights granted to children who, like animals, are not able to enforce those rights themselves, and may not even understand that they possess them. Neither of those conditions is necessary for someone—whether a child or an animal—to possess rights. The fact that the numerous rights cataloged by the majority are granted by statute does not change their character as rights; at most, it leaves open the question of whether courts should grant rights to animals—not whether animals are capable of holding rights.[6]

If the proposition that no rights may be awarded to a being who cannot shoulder responsibilities were based on social contract theory, we could not explain why children or profoundly disabled adults—who have no capacity to enter into a social contract—can be

---

[6] Amici UK-Based Legal Academics, *et al.*, explain that under either of the dominant theories of rights (the "interest theory" and the "will theory"), the conditions for granting a right to Happy would be met. Under the interest theory, Happy must have an interest in liberty (or less restrictive confinement) and the decision to grant a right must be, at least in part, for Happy's own sake. Under the will theory, Happy must be able to exert some form of normative control over correlative duty bearers, but that can be exercised by a representative (public or private) acting in her behalf (*see* Brief of Amici Curiae Joe Wills, *et al.*, UK-Based Legal Academics, Barristers and Solicitors in Support of Petitioner-Appellant, at 10-17).

granted rights.[7]  To say, "they are part of the human species" is no answer, because social contract theory does not propose that members of a species can bind other members of the same species to a social contract without their consent.  We grant children and disabled persons rights simply because we, as a society, want to.  Whether we do so because we see ourselves in them, because God commands us to, because we fear a slippery slope of eugenics, because we are charitably inclined, or for some other reason, does not matter; the point is that we can, and constantly do, grant rights to living beings who bear no responsibilities and may never be able to do so. [8]

---

[7] As our colleague Judge Fahey observed, "[e]ven if nonhuman animals cannot bear duties, the same is true of human infants or comatose human adults, yet no one would suppose that it is improper to seek a writ of habeas corpus on behalf of one's infant child or parent suffering from dementia" (*Lavery*, 31 NY3d at 1057 [Fahey, J., concurring]).

[8] Like the United States, many other countries have given animals rights.  The Supreme Court of India—a country that shares an English common law heritage with the United States—has recognized rights for animals.  India's Supreme Court has recognized that the Indian Constitution's due process clause applies to all species (*Animal Welfare Bd. of India v A. Nagaraja*, 7 SCC 547 ¶ 62 [2014]).  That court also interpreted the *parens patriae* doctrine, which originated in English common law, as requiring the court "to take care of the rights of animals, since they are unable to take care of themselves as against human beings" (*id.* at ¶ 26; *see Hawaii v Standard Oil Co. of Cal.*, 405 US 251, 257 [1972] [describing the English constitutional system as the origin for the *parens patriae* doctrine, which referred to the King's power "as guardian of persons under legal disabilities to act for themselves"]).  Courts in other countries have granted habeas petitions on behalf of animals (*Presented by AFADA About the Chimpanzee "Cecilia" – Nonhuman Individual*, File No. P.72.254/15 [Third Court of Guarantees, Mendoez Argentina, Nov 3, 2016] [granting a habeas petition brought on behalf of a chimpanzee in a zoo and ordering the chimpanzee transferred to a sanctuary in Brazil]; *Luis Domingo Gomez Maldonado contra Corporacion Autonoma Regional de Caldas Corpocaldas*, AHC4806-2017 [Supreme Court of Colombia, Civil Cassation Chamber, July 26, 2017] [granting a habeas petition brought on behalf of a bear and ordering the bear transferred to a more suitable habitat, preferably an identified natural reserve]; *see also Islamabad Wildlife Mgmt. Bd. v Metropolitan Corp. Islamabad*, Islamabad High Ct, Pakistan, May 21, 2020, Athar-Minallah, C.J., W.P. No.1155/2019 [granting the petition filed on behalf of an elephant and

Inherently, then, to whom to grant what rights is a normative determination, one that changes (and has changed) over time.  If society determines that humans should not torture dogs, then dogs have a right to be free from torture.  The dogs' right to be free from torture does not emanate from their ability to take on duties or responsibilities; instead, it emanates from society's determination that a sphere of action—the ability of dogs to exist without being subjected to torture by humans—is a right worthy of protection.

Society's determination as to whether elephants have a right to be free of oppressive confinement, which they may test through habeas corpus, is not likely to be the same today as it was 100 years ago.  At its core, this case is about whether society's norms have evolved such that elephants like Happy should be able to file habeas petitions to challenge unjust confinements.  It is not about whether Happy is a person or whether Happy can bear responsibilities or enter into a social contract.  The degree to which courts, rather than legislatures, should grant such rights is a wholly different question.

## II

As the majority acknowledges, "[t]he centuries-old writ [of habeas corpus] originated in English law and has been a steadfast pillar of our common law" (majority op

---

requiring the elephant's transfer from a zoo to a sanctuary]).  Native American tribes long nurtured symbiotic relationships with animals in ways that "prohibited the physical and spiritual mistreatment of animals since time immemorial" (Sarah Deer & Liz Murphy, *'Animals May Take Pity On Us': Using Traditional Tribal Beliefs to Address Animal Abuse and Family Violence Within Tribal Nations*, 43 Mitchell Hamline L Rev 703, 703-704, 706-718 [2017]; *see also* Angela Harris, *Should People of Color Support Animal Rights?*, 5 J Animal L 15, 28 [2009]).

at 7). Its history and usage, both in England and the United States, resoundingly rejects several of the majority's contentions. Most fundamentally, the writ was used to grant freedom to slaves, who were considered chattel with no legal rights or existence. Indeed, the various rights held by animals today, as partially cataloged by the majority, are far greater than those held by enslaved persons in England or America, who had none. Similarly, the writ was used to grant freedom to wives and children, who, though not chattel, had few or no legal rights and legally were under the dominion of husbands and fathers. They, too, had rights that paled in comparison to those held by animals today. Additionally, the writ was flexibly used to transfer custody when circumstances demanded it, particularly in the case of children—a point contrary to the majority's view that the writ cannot be used to transfer custody from a miserable situation to one less fraught. Not only does the history of the writ's usage destroy the foundations of the majority's contention, it shows how the writ was used by enlightened judges to nudge advances in the law. By freeing one enslaved person through a habeas petition, or removing one wife or child from an abusive husband or father, a court did not change the law for all, but it did cast a light on the underlying issues (slavery or the treatment of women and children), sparking public debate and sometimes leading to broader legislative change.

Courts did not base their habeas corpus decisions on whether detention was illegal under existing statutory or common law; instead, they conducted a case-by-case analysis for each habeas petition, considering whether a petitioner's confinement was unjust based on a balancing of the benefits and harms of the confinement. Habeas petitions were not

limited to detainment orchestrated or managed by the government; habeas equally reached private confinements. It was common for third parties to file habeas petitions on behalf of others who were confined. Running throughout these qualities of the Great Writ is the maxim that habeas corpus is an innovative writ—one used to advocate for relief that was slightly or significantly ahead of the statutory and common law of the time.

A

For at least a few thousand years, slavery was viewed as legitimate, even necessary. The Code of Hammurabi, from circa 1772 BCE, prescribed death for anyone helping an enslaved person to escape or housing an enslaved person who had run away (The Code of Hammurabi §§ 15-16 [L.W. King trans.], available at https://avalon.law.yale.edu/ancient/hamframe.asp). Other provisions punished enslaved people themselves for certain actions or behaviors; for instance, if an enslaved person struck a free man or denied enslavement, the Code called for cutting off one of the enslaved person's ears as punishment (*id.* §§ 205, 282).

In ancient Egypt, Greece, and Rome, war was the principal catalyst for enslavement. Ancient Egypt, for example, enslaved the defeated soldiers of Nubian and Somali people (James Walvin, A Short History of Slavery, Part I, ch 1 [2007]). In ancient Greece, slavery was "basic to the conduct of Greek democratic life" because Greek citizens relied on enslaved people for heavy physical tasks and domestic labor, freeing their time for civic duties (*id.*). Aristotle described the enslaved person as "a living possession" who "wholly belongs to [his master]" (Aristotle, Politics, Book I, Part IV). He viewed "the use made of

slaves and of tame animals" as "not very different; for both with their bodies minister to the needs of life" (*id.*). Victories of the Roman Empire across a vast geography resulted in more than half a million enslaved persons annually for Rome (*id.*).

In the millennium after the fall of Rome, slavery persisted in Europe as a "mosaic of systems, held together by trade and by slave-trading links" (Walvin, *supra*, at Part 1, ch 2). "Villeinage," a vestige of feudalism, was an early form of unfree status in English society (William M. Wiecek, *The Origins of the Law of Slavery in British North America*, 17 Cardozo L Rev 1711, 1716 [1996]). In 1547, England passed the (short-lived) Vagrancy Act, which allowed for the enslavement for two years of "vagaboundes," who could be sold or leased by their owners, and for whom death by hanging was the penalty for escape (*id.* at 1718). Thereafter, European slavery became reserved mostly for people of African descent (*id.* at 1723-1724).

English slaveholders proceeded by action of trover—an action to protect chattel — to enforce their rights in enslaved persons (*id.* at 1724). Eventually, as abolitionists began to challenge the legitimacy of slavery, the King's Bench held that trespass *per quod servitium amisit* (trespass by which service is lost) would lie instead of trover; by which change the court subtly suggested a different way of thinking about enslaved people (*id.*).

In the United States, slavery persisted longer than it did in England, and laws institutionalized and protected it. Histories of African slavery in North America often begin with the sale of 20 enslaved Africans by a Dutch ship captain to English settlers in Jamestown, Virginia in 1619, but some enslaved Africans entered the colonies even earlier

(David Brion Davis, Inhuman Bondage: The Rise and Fall of Slavery in the New World 124 [2006]).  By the middle of the 17th century, the Dutch in New Netherland (now New York) were more dependent on Black slave labor than the English in the colonies of Virginia and Maryland (*id.*).  The United States Constitution explicitly embedded slavery in various ways (*see, e.g.,* Paul Finkelman, *The Founders and Slavery: Little Ventured, Little Gained*, 13 Yale J L & Humanities 413, 414-15, 427, 438 [2001]).

Constitutional law continued to "protect[] slavery and undermine[ ] the liberty of free blacks" as the young country developed (Paul Finkelman, *Race, Slavery, and Federal Law, 1789-1804: The Creation of Proslavery Constitutional Law Before* Marbury, 14 U St Thomas L J 1 [2018]).  Congress passed a fugitive slave law, rejected legislation that would prevent the kidnapping of free Black people, prevented free Black people or enslaved persons from carrying mail from one place to another, rejected immigrants who were Black from naturalizing as citizens, and prevented free Black people from joining the military (*id.*).

In 1808, Britain and the United States outlawed participation in the African slave trade (Davis, Inhuman Bondage, *supra*, at xiv), but slavery remained a cornerstone of society and economy, as the children of enslaved people were also considered enslaved. Further limiting the rights of enslaved individuals and free individuals of African descent, in 1857, the United States Supreme Court held in *Dred Scott v Sandford* that people of African descent, whether enslaved or free, were not included as "citizens" under the United States Constitution.  Therefore, no Black individuals in the country were afforded the

rights, privileges and immunities the Constitution provided to citizens (60 US 393 [1857]).

Counsel for Sandford argued that "the Constitution of the United States was never designed to consider black men as citizens.  It maintains throughout that man can have property in man; and so sacred is this description of property, that the Constitution pledges the force of the Union to protect it" (NY Times, *The Argument in the Case of Dred Scott*, Dec. 18, 1856 at 1).  The *Dred Scott* decision was met with applause in the southern states, and "[m]ost Northern Democrats accepted it and even praised it" (Paul Finkelman, *Scott v. Sandford: The Court's Most Dreadful Case and How It Changed History*, 82 Chi-Kent L Rev 3, 5 [2007]).

It is against that long-entrenched background of legally sanctioned slavery that the courts of England and the United States worked, through the Great Writ, to secure liberty for those deemed chattel, equated, at most, with animals.  Two seminal cases, one in England (*Sommersett's Case*), one in New York (the *Lemmon Slave Case*) show how the Great Writ was flexibly used by the courts as a tool for innovation and social change.

The *Sommersett* case in England involved the use of habeas corpus to free a slave; the case was celebrated by abolitionists, though its impact was incremental, not tidal. James Sommersett was an enslaved Black man on whose behalf three abolitionists submitted a habeas corpus petition (*The Somerset Case*, Howell's State Trials, vol 200, cols 1-6, 79-82, National Archives of the United Kingdom; *see also* Paul D. Halliday, Habeas Corpus: From England to Empire 174 [2010]).  The habeas petition alleged that Mr. Sommersett was confined on a ship bound for Jamaica and sought his freedom (*The*

*Somersett Case*, Howell's State Trials, *supra*). Mr. Sommersett was enslaved by Charles Steuart, who had purchased him in Virginia and brought him to England, where Mr. Sommersett ran away (*id.*; Halliday, *supra*, at 174). Mr. Steuart then had Mr. Sommersett seized and sent him to Jamaica to be sold as a slave (*The Somerset Case*, Howell's State Trials, *supra*).

Lord Mansfield granted Mr. Sommersett's habeas petition, liberating him, but on the narrow basis that Mr. Steuart's return (what we would now describe as a verified answer) filed in response to the habeas petition was insufficient (*id.*). Given the papers before him, it was Lord Mansfield's view that "[t]he only question before us is, whether the cause on the return is sufficient[]." He characterized the return as merely stating that Mr. Sommersett "departed and refused to serve; whereupon he was kept, to be sold abroad" (*id.*). Lord Mansfield included strong language criticizing slavery, stating for example that slavery "is so odious, that nothing can be suffered to support it, but positive law" (*id.*). Nonetheless, the narrow basis of his ruling revealed "the Janus-faced quality of habeas corpus: that it could do so much, and so little, at once" (Halliday, *supra*, at 175). James Sommersett's case illustrates the opportunity and limitations of habeas corpus. The writ is a procedural tool with a storied history of opportunity for challenging social norms, but one inherently limited by its necessarily case-by-case approach.

In *Lemmon v People*, our own Court upheld the grant of a habeas petition brought on behalf of eight slaves seeking liberation from their incarceration in a house in Richmond, New York (20 NY 562 [1860]). Juliet Lemmon claimed that the eight

individuals were her slaves and that she was in transit between Virginia and Texas, both of which were slave states, when she had to stop in New York out of necessity. She further claimed that she never intended to sell her slaves. Louis Napoleon, a free Black New Yorker active in the abolitionist movement, commenced a habeas petition on behalf of Lemmon's slaves upon learning of their arrival. Judge Elijah Paine heard the habeas petition. He granted the petition, considered its merits, and ruled that the eight slaves were now free. Judge Paine based his ruling on two principles: first, because Juliet Lemmon had voluntarily brought her slaves into New York, a New York statute emancipated them; and second, "and of greater historical importance, however, Judge Paine ruled the slaves free based on a higher moral authority. 'Beyond New York law,' Judge Paine wrote, 'by the law of nature no one can have a property in slaves'" (Historical Society of the New York Courts, *The Lemmon Slave Case*, available at https://history.nycourts.gov/the-lemmon-slave-case/ [accessed June 9, 2022]). Chief Judge DiFiore recently lauded Judge Paine as "courageous" and "heroic" for his grant of habeas corpus freeing Ms. Lemmon's slaves (*id*., Video Introduction at 0:31, 1:14).

The Court of Appeals affirmed Judge Paine's decision. In doing so, it rejected Ms. Lemmon's argument that the enslaved persons remained her property because "[no] civilized State on Earth can maintain this absolute outlawry of negro slavery; for in some of its forms slavery has existed in all ages" (Report of the Lemmon Case 19 [1860], available at https://www.loc.gov/item/03020167/). In affirming Judge Paine's decision

granting relief through the Great Writ, Judge William B. Wright, joined by three judges, sharply criticized the institution of slavery:

> ". . . for slavery is repugnant to natural justice and right, has no support in any principle of international law, and is antagonistic to the genius and spirit of republican government. Besides, liberty is the natural condition of men, and is world-wide: whilst slavery is local, and beginning in physical force, can only be supported and sustained by positive law. 'Slavery,' says Montesquieu, 'not only violates the laws of nature and of civil society; it also wounds the best forms of government; in a democracy where all men are equal slavery is contrary to the spirit of the Constitution'" (*Lemmon*, 20 NY at 617).

The *Lemmon* case illustrates how courts have used and should use the common law writ of habeas corpus to expand liberty interests that were not just controversial at the time, but denied by "positive" law legitimizing slavery. Three years earlier, the United States Supreme Court had decided *Dred Scott v Sandford*, in which it rejected Mr. Scott's claim that though he was enslaved in Missouri, he became free when his owners took him to a state where slavery was illegal (60 US 393 [1857]). "The Court of Appeals ruling in [the *Lemmon Slave*] case was in direct conflict with the Supreme Court's infamous Dred Scott decision of 1857 and it represented one of the most unyielding anti-slavery decisions made by any Court in the United States prior to the Civil War*"* (NY St Unified Court System, *The Lemmon Case: 1852-1860: Freedom Won for Eight Enslaved People in New York and Justice Takes a Step Forward*, Message from Chief Judge Janet DiFiore, available at http://ww2.nycourts.gov/courts/9jd/lemmon_slave_case.shtml [accessed June 9, 2022]). Thus, even a direct conflict with the U.S. Supreme Court's decision in *Dred Scott* did not

stop our Court from affirming the use of the Great Writ to free eight enslaved individuals who Ms. Lemmon considered her property.

As with Mr. Sommersett's case, the *Lemmon* case did not end slavery; it freed only the subjects of the habeas petition before the Court. But it added Judge Paine's voice, and the voice of our Court, to the side of abolishing slavery. A scant nine months later, South Carolina identified as one of the "immediate causes" of its decision to secede "the action of the non-slaveholding States . . . [which] have denied the rights of property established in fifteen of the States and recognized by the Constitution; they have denounced as sinful the institution of slavery" (*Confederate States of America - Declaration of the Immediate Causes Which Induce and Justify the Secession of South Carolina from the Federal Union*, Yale Law School Lillian Goldman Law Library, the Avalon Project: Documents in Law, History            and            Diplomacy,            available            at https://avalon.law.yale.edu/19th_century/csa_scarsec.asp).

Underscoring the import of the *Lemmon* case, and as a result the import of the Great Writ as well, the New York State Unified Court System recently launched a traveling exhibition extolling the *Lemmon* decision (*see* NY St Unified Court System, *The Lemmon Case*, *supra*).[9]

B

---

[9] New York was not the only jurisdiction to use habeas corpus to recognize a liberty right in people legally considered chattel (*see Jackson v Bulloch*, 12 Con 38 [1837]).

Like slavery, women's treatment as inferior to men has a long history. Aristotle wrote that "the relation of male to female is by nature a relation of superior to inferior and ruler to ruled" (Ian Broinowski, The Pakana Voice [2020]). According to Martin Luther, women have "a mind weaker than man" (Martin Luther, Commentary on Genesis, ch 2, Part V, 27b [1545]); according to John Calvin, "all women are born, that they may acknowledge themselves inferior in consequence of the superiority of the male sex" (John Calvin, Commentary on 1 Corinthians, 1 Corinthians 11: 1-16, at 299); according to Charles Darwin, "[t]he chief distinction in the intellectual powers of the two sexes is shewn by man attaining to a higher eminence, in whatever he takes up, than can women—whether requiring deep thought, reason, or imagination, or merely the use of the senses and hands" (Charles Darwin, Descent of Man 564 [1896]); and according to Napoleon Bonaparte, "[n]ature intended women to be our slaves . . . What a mad idea to demand equality for women! They are our property, we are not theirs" (Emil Ludwig, Napoleon 599-600 [Eden & Cedar Paul trans. 1926]). The process of liberating women from those noxious views was advanced through the application of the writ of habeas corpus, though, as with racial discrimination, harmful and discriminatory views about women have not been eradicated even today.

Under English common law, "husband and wife [were] one person in law," or in other words, "the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband" (1 William Blackstone, Commentaries, ch 15). During marriage, "a wife simply had no legal

existence.  She became, in the words of the Seneca Falls Declaration of Sentiments, 'civilly dead'" (Claudia Zaher, *When a Woman's Marital Status Determined Her Legal Status: A Research Guide on the Common Law Doctrine of Coverture*, 94 Law Libr J. 459, 460 [2002]).  That rule was called "coverture" (Blackstone, Commentaries, ch 15).  Under coverture, any property or debt belonging to a woman became her husband's property upon marriage (*see id.*).  Because a woman's legal identity was erased upon marriage, the common law granted husbands the right to beat their wives to "chastise" them (*id.* ["(B)y an old law, a husband was justified in using moderate correction against his wife but barred from serious violence"]).

The definition of rape under English common law did not include sexual assaults by husbands against wives (Jill Elaine Hasday, *Contest and Consent: A Legal History of Marital Rape*, 88 Cal L Rev 1373, 1391 [2000]).  As a leading treatise on criminal law stated, "the true reason why the husband, who has sexual intercourse with his wife against her will, is not guilty of rape is that such intercourse is not unlawful. . . .  Sexual intercourse between husband and wife is sanctioned by law; all other sexual intercourse is unlawful" (Rollin Morris Perkins, Criminal Law 110 [1982]).  As Chief Justice Lord Matthew Hale wrote, "the husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract" (*id.*).

American jurisdiction adopted the English common law, and coverture limited the rights of women in early America.  In the 18th century, coverture deprived American

married women of their property, which husbands came to own in fee simple.  Husbands

could possess, use and mortgage the property they gained from marrying women, and

creditors could seize that property or interest in the property (Joan C. Williams, *Married*

*Women and Property*, 1 Va J Soc Poly & L 383, 385 [1994]).

New York courts implemented English common law and placed obstacles to

women's divorce and to married women having any property rights (Richard A. Dollinger,

*Judicial Intervention: The Judges Who Paved the Road to Seneca Falls in 1848*, 12 Judicial

Notice 4, 5 [2017]).  The New York Legislature started to erode the doctrine of coverture

beginning in 1828 through trusts that could retain some property rights for married women,

but those changes were slow and minimal (*id.*).  In 1837, assemblyperson Thomas Herttell

introduced a bill that would have allowed women to retain after marriage all property

owned at the time of marriage.  He called the doctrine of coverture "uncomfortably close"

to slavery, which had been outlawed in New York ten years prior, asserting that "[o]nly

her husband's inability to sell her outright saved her from the status of an unqualified slave"

(*id.*).  The bill failed to emerge from the Assembly, let alone become law (*id.*).  In the

1840s, "bills related to women's property flooded the legislature," but the legislature

refused to pass any reform for women's rights (*id.* at 8).

Against that background, the courts of England and the United States used the Great

Writ to grant relief to women and children in the face of statutory and common law

rendering their mistreatment by men lawful.  Habeas corpus freed Catherine Marsden, for

example, when her husband—who had abandoned her but, upon learning that she had

begun proceedings in the church courts seeking to have him pay maintenance to support her and their children, lured her to his city on the pretense of reconciliation and then locked her in a hayloft (Halliday, *supra*, at 46-47).[10]  Thus, although the common law gave her husband legal dominion over her, the court used the writ of habeas corpus to order her release.

Similarly, before Lady Rawlinson remarried, she put her estate out of the reach of her groom, Michael Lister.  The marriage failed; divorce being out of the question, the couple made a deed of separation, which worked until Mr. Lister wanted more money. Lady Rawlinson refused, and Mr. Lister and an accomplice kidnapped her as she left church, hiding her in a remote location.  Responding to a writ of habeas corpus procured on her behalf, Mr. Lister argued, "by law, the husband has coercive power over the wife" (*id.* at 177).  King's Bench agreed with that legal proposition, but relied on the separation agreement to hold that Mr. Lister's right to restrain his wife had been eroded, and ordered Lady Rawlinson's release (*id.*).

As another example, habeas corpus could limit a father's custody of his children, even though the common law in 18th century England vested custody of children in the father, not the mother.  Anne Bissell was a six-year-old child at the center of a custody dispute in 1774 (*id.* at 131).  After Anne's mother had fled with Anne due to her husband's mistreatment, Anne's father used habeas corpus to force Anne's mother to bring Anne to

---

[10] Professor Halliday's methodology involved examining all writs of *habeas corpus ad subjiciendum* issued from the King's Bench every fourth year from 1502 to 1798, inclusive, yielding a total of 2,757 individual subjects (Halliday, *supra*, at 319).

court (*id.*). Lord Mansfield, overseeing the habeas case, acknowledged that "the natural right is with the father" but given the father's inappropriate conduct toward the mother, and his bankruptcy, decided to "do what shall appear best for the child" (*id.*). Through his resolution of the case, Lord Mansfield "assigned custody in defiance of the father's expectation, supported by common law, that custody should be his. As in all habeas decisions, the court declared the bounds of jurisdiction, even the jurisdiction of fathers" (*id.*). The early English cases of Mrs. Marsden, Lady Rawlinson and Anne Bissell show that courts employed the Great Writ to challenge and bypass controlling statutory and common law when deciding habeas corpus petitions; the writ allowed courts to assess each case individually and whether the confinement was unjust based on fairness and a balancing of interests.

Further underscoring the flexibility of the Great Writ, its history evinces that habeas corpus could be used to transfer custody from one confinement, if determined to be unlawful, to another type of custody; habeas petitions were not required to seek or result in total liberation as the remedy. That aspect of habeas corpus is evident across issues impacting children, women, and enslaved people. Frances Howland was a ten-year-old child over whom custody had been assigned to Mary Johnson (*id*. at 128). Frances's uncle, however, filed a habeas petition to bring Frances into court, arguing that his brother's will made him guardian. The Justices considering his claim wrestled with whether they could change Frances's custody or whether they were allowed to "only set her at liberty" because the case arose from a habeas petition. They decided the former, changing the custody of

Frances from Ms. Johnson to Frances's uncle, even though Frances was "very unwilling" to leave Ms. Johnson. The 1724 decision "marked a step in a new direction: using the writ to assign custody, not simply to release from it" (*id.* at 128-129). Anne Bissell's transfer from the custody of her mother to a school where both of her parents could visit her, deemed to be in her best interest (which was not then a concept in the common law or statute), occurred 50 years after Frances's case, suggesting the "new direction" of using habeas corpus to transfer custody had become a norm.

In the case of Bridget Hyde—a young teenager living with her mother and step-father (Sir Robert Viner, Lord Mayor of London) but claimed by John Emerton as his wife—the King's Bench issued writs of habeas corpus on the Lord Mayor to produce Bridget in court, and then, Lord Chief Justice Hale, in a striking bit of innovation, "bad[e] her take her choice who she would go to": to Emerton or Viner (*id*. at 125). Indeed, other decisions by Chief Justice Hale further reflect an understanding that the writ could innovate to meet society's evolving notions of fairness. "During Hale's five years overseeing King's Bench, we find the first writs used by wives against abusive husbands, as well as the first writs employed to bring in women to swear articles of the peace; to resolve a child custody dispute; and to explore the detention of an alleged 'lunatic'" (*id.*).

Women also used habeas corpus to transfer custody from their husbands to their parents. As discussed, women in 18th century England had severely restricted rights, and society defined them by their relationships to their fathers when unmarried and to their husbands when married (Elizbeth Foyster, *At the Limits of Liberty: Married Women and*

*Confinement in Eighteenth-Century England*, 17 Continuity & Change 39, 49 [2002]).
Custody transfer arose when abused women fled to their parents (*id.*).  Husbands would
file habeas corpus petitions seeking to order their wives transferred back to their own
households, while parents would argue "that by their physical cruelty husbands had
relinquished their rights to custody of their daughters" (*id.*).

Habeas petitions were also filed on behalf of women who were confined or sent to
madhouses by their husbands, as well as on behalf of husbands seeking to regain custody
of their wives when their wives escaped and obtained refuge in other households (*id.* at
42).  In those contexts, the writ made the King's Bench a "forum where the boundaries of
men's rights and women's freedoms were tested" (*id.*).  Private "madhouses," which
proliferated in the 18th century, gave husbands another tool to control their wives:
husbands could send their wives to minimally regulated madhouses on claims that their
wives were insane when, in reality, their wives merely failed to obey their orders (*id.* at
47).  In response, women or people acting on their behalf filed habeas petitions.  A habeas
petition freed Jane, the wife of Thomas Taylor, after Thomas allegedly detained her for
three months in their house, keeping the front door locked, the back door nailed shut, and
the windows boarded (*id.* at 44).  According to the affidavits in support of Jane's release,
Thomas did not let Jane leave the home, would have a servant deliver bread, water, and
medicine through Jane's window, and would severely beat her (*id.*).  The affidavits were
filed after Jane passed letters through a hole in her window begging for help (*id.*).  A habeas
petition secured the release of Deborah D'Vebre—who had been confined in a madhouse

by her husband—after a doctor inspected her and determined that he could not see "the least ground or foundation for confining her in the said madhouse" (*id.*). For women like Jane and Deborah, "[t]he writ [of habeas corpus] acted as a lifeline for freedom" (*id.* at 49), used to overcome their husbands' common law right to restrain them.

Finally, habeas corpus was used to transfer custody in the context of slavery as well. When abolitionists attempted to use habeas corpus to retrieve Thomas Lewis, an enslaved person, from a ship about to sail for Jamaica, Lord Mansfield explained that previous habeas corpus petitions he had granted for enslaved persons who had been impressed into navy service were not meant to "free slaves, but to move them from one form of involuntary labor to another: to retrieve them from the navy's service so they could return to their masters' service, in the same manner that habeas was used to retrieve runaway apprentices from impressment" (Halliday, *supra*, at 174-175).

The flexibility of the Great Writ made it an innovative writ that could challenge existing laws and social norms and inch society toward dramatic changes. The writ of habeas corpus "encouraged the justices to do much more than declare a prisoner remanded, bailed or discharged" (*id*. at 101). Instead, the writ became a vehicle for judges to negotiate settlements between parties, and judges' role in those negotiations involved "constraining—sometimes undermining—the statutes or customs on which other magistrates acted" (*id.*). Through that process, "the justices defined what counted as jurisdiction and what counted as liberties" (*id.*). The "flexibility, creativity, and widening purview" vested in judges through habeas corpus led to judges "broaden[ing] the principles

that legitimated a widening oversight of detention in all forms" (*id.*).  Thus, within that "widening oversight," habeas was used to challenge abusive husbands in the 1670s, to question detentions justified by concerns of state safety in the last decade of the 17th century, and to "oversee other forms of detention that involved no wrongdoing" such as "apprenticeship, slavery, and naval impressment" in the mid-18th century (*id.*).

The same qualities and uses of the writ found in English history are evident in the United States as well.  The writ of habeas corpus was understood as a means for women and children to challenge confinement or custody.  As in England, women had severely restricted rights under coverture in America, and their husbands had a legal right to restrain them, but if the husband "restrain[ed] [his wife] of her liberty unreasonably, or imprison[ed] her, she may have relief by habeas corpus" (1 Zephaniah Swift, A System of the Laws of the State of Connecticut 1795, at 201).

*Abbott v Abbott*, an 1877 case from the Maine Supreme Judicial Court, is one example of the vast power men had over their wives and the availability of habeas corpus as one of the few possible remedies.  In *Abbott*, the court held that a woman could not sue her former husband in tort for forcibly carrying her to an insane asylum, because the doctrine of coverture gave rise to no cause of action for violence by the husband to the wife, as their identities merged upon marriage (*Abbott v Abbott*, 67 Me 304 [1877]).  The court, however, observed that "the married woman has remedy enough":  the criminal courts, prosecution for divorce at her husband's expense, and "the privilege of the writ of *habeas corpus*, if unlawfully restrained" (*id.* at 307 [emphasis in original]; *see also Main*

*v Main*, 46 Ill App 106, 107-108 [Ill App Ct – 3d Dist 1892] [holding that, as in *Abbott*, a woman could not sue her husband for forcibly admitting her into an insane asylum but observing that the woman is "not without protection" because she could pursue criminal charges, sue for divorce, and "may have a writ of habeas corpus if unlawfully restrained"]).

As in England, the writ was used to transfer custody of children from one parent to another for children "under the age of discretion"; courts upon granting the writ would determine who should obtain custody of the child (*see* Dallin H. Oaks, *Habeas Corpus in the States: 1776-1865*, 32 U Chi L Rev 243, 270-271, 273-274 [1965]; *see*, *e.g.*, *Mercein v People ex rel. Barry*, 25 Wend 64 [Court for the Correction of Errors of New York 1840]; *People ex rel. Olmstead v Olmstead*, 27 Barb 9 [NY Sup Ct 1857]).  Indeed, "[t]here [were] numerous cases where courts asserted and exercised their powers to resolve issues on the guardianship of young children by habeas corpus" (Oakes, *supra*, at 274).  Parents also used habeas corpus to regain custody of children who enlisted in the Civil War without their consent (*see* Frances M. Clarke & Rebecca Jo Plant, *No Minor Matter: Underage Soldiers, Parents, and the Nationalization of Habeas Corpus in Civil War America*, 35 Law & Hist Rev 881 [2017]).

C

As with *Sommersett's Case* and the *Lemmon Slave Case*, the cases liberating women and children did not bring an end to those abuses on a wholesale basis.  Because of the inherently case-by-case way in which habeas corpus works, each case acted directly only on the particular petitioner seeking relief.  However, those cases did spark dialogue and

change on a broader scale.  The decisions liberating women from "madhouses" provide a

helpful illustration.  Those cases did not lead to a wholesale closure of such institutions or

a release of all or most women confined in them, but the writs increased public awareness

that led to significant legislative reform.  Through habeas corpus, "[t]he stories told in the

King's Bench about wives who were wrongfully confined in private madhouses

contributed to public awareness of the abuses of these institutions" (Foyster, *supra*, at 52).

First heard in court, the injustices of private madhouses became widely reported,

"provok[ing] public alarm and mounting criticism [that] eventually led to the 1774 Act for

Regulating Private Madhouses" (*id.*).  Though that Act failed to eliminate all the ills of

madhouses, its enactment shows how the innovative quality of the writ of habeas corpus

can lead to broader social change.  The writ is a tool for society to challenge confinement,

construed broadly, and can document and raise awareness of injustices that may warrant

legislative, policy, or social solutions.

The important points from the history and use of the Great Writ can be summarized

as follows: first, even when positive (statutory or common) law renders a confinement

lawful, the writ may be used to challenge a particular confinement as unjust based on the

particular circumstances; second, the writ may be invoked on behalf of chattel (enslaved

persons) or persons with negligible rights and no independent legal existence (women and

children); third, it is a proper judicial use of the writ to employ it to challenge conventional

laws and norms that have become outmoded or recognized to be of dubious or contested

ethical soundness; and finally, the writ may be used to transfer a petitioner from an onerous

custody to a less onerous custody. That leaves us here: animals can and do bear rights, and courts can use habeas corpus to grant rights to anyone regardless of their legal status as a person, even when positive law says otherwise. The remaining, and only real, question in this case is, when should they?

## III

As human knowledge of animal capabilities and needs has increased over the past centuries, social norms concerning human treatment of animals, and the rights granted to them, have also changed significantly. Whether an elephant could have petitioned for habeas corpus in the 18th century is a different question from whether an elephant can do so today because we know much more about elephant cognition, social organization, behaviors and needs than we did in past centuries, and our laws and norms have changed in response to our improved knowledge of animals.

### A

Early America had a strictly property-based view of animals. Over the last two centuries, that view has greatly eroded. Through most of the 19th century, animals were seen and treated as property and were used by humans for both entertainment and hard labor. A particularly troubling example of animals' use for entertainment was the practice of wealthy individuals and families watching "vivisections," or dissections of unsedated live animals (Claire Priest, *Enforcing Sympathy: Animal Cruelty Doctrine after the Civil War*, 44 L & Social Inquiry 136, 143 [2019]). The first efforts to rein in animal cruelty were facilitated under the public nuisance doctrine, which operated only when the cruelty

occurred in public, or under causes of action protecting an owner's property rights in an animal (including the malicious mischief doctrine) when a third party interfered with an owner's property rights in an animal by harming it (*id.*). Under those doctrines, infliction of undue or excessive suffering on animals was regulated because of the effect it had on *humans* in society. Animal cruelty was punished through the public nuisance doctrine because the cruelty disturbed the peace for members of society enjoying public spaces. It was punished through the malicious mischief doctrine because it damaged someone's property. Thus, initial laws protecting animals did not expressly do so for the welfare of the animal *per se*.

In 1828, New York became the first state to enact an anticruelty law applying to animals (*id.* at 146-147). The statute made it a misdemeanor to "maliciously kill, maim, or wound any horse, ox, or other cattle, or sheep, belonging to another," or to "maliciously and cruelly beat or torture any such animal, whether belonging to himself or to another" (*id.*). Nineteen other states followed suit with similar statutes by 1865 (*id.*). However, those statutes were largely interpreted as mere legislative reiterations of the preexisting common law rules of public nuisance and malicious mischief (*id.*).

A major shift occurred after the Civil War, when the animal welfare movement grew significantly. Advocates' concern for animal suffering and a "widespread desire for greater social control" contributed to the rise of the movement (*id.* at 148, 150). The American Society for the Prevention of Cruelty to Animals (ASPCA) was founded in New York in 1866. ASPCA's successful lobbying led to the enactment of an expansive anti-cruelty

statute in 1867 that criminalized the infliction of pain on animals and empowered the ASPCA itself to investigate and prosecute people for animal cruelty—an extraordinary power for a nongovernmental organization (*see Davis v Am. Soc'y for Prevention of Cruelty to Animals*, 75 NY 362 [1878] [refusing to enjoin the President of the ASPCA from making arrests of persons he determined were cruelly slaughtering hogs]). The growing prosecutions and developments in the law signaled a shift in view toward animals: animal suffering was no longer simply seen as evil because of its effect on humans and society, but was now also viewed as an evil due to its effect on animals themselves.

States across the country enacted animal cruelty laws like New York's after the Civil War. This time, courts did not interpret the statutes to restrict them to the public nuisance and malicious mischief doctrines (Priest, *supra*, at 156). Instead, court decisions reflected the shift toward considering suffering from the animals' perspectives (*id.* at 156-157). The Arkansas Supreme Court, for example, considered the state's new anticruelty acts as "not made for the protection of the absolute or relative rights of persons, or the rights of men to the acquisition and enjoyment of property, or the peace of society" (*id.* at 157, quoting *Grise v State*, 37 Ark 456, 457 [1881]). Instead, the statutes "seem[ed] to recognize and attempt to protect some abstract rights in all that animate creation, made subject to man by the creation, from the largest and noblest to the smallest and most insignificant" (*id.*). Reflecting that more expansive view of the post-Civil War anti-cruelty statutes, courts across states eliminated intent or malice elements previously required in animal cruelty offenses (*id.* at 160).

The history of abolition and other human-centered movements and the history of the animal welfare movement intersected in some meaningful ways.  Through the Civil War, the "abolition of slavery and the horror of battle—documented in thousands of wartime photographs of dead soldiers and horses—brought suffering and human rights to a national audience, therefore catalyzing a national movement" (Janet M. Davis, *The History of Animal Protection in the United States*, Organization of American Historians [May 27, 2022], https://www.oah.org/tah/issues/2015/november/the-history-of-animal-protection-in-the-united-states/).  In the post-Civil war era, "[a]nimal protectionists believed that creaturely kindness was a marker of advanced civilization, which could rectify a fractured nation and world" (*id.*).  Indeed, there were direct ties between abolitionists and animal welfare advocates in America (*id.; see also* Priest, *supra*, at 148), and even more direct ties between the abolition and animal rights movements in Britain (*id.*).  In the United States, the animal rights movement also may have contributed to modern interventionist and liberal ideas about government, and animal rights groups began thinking about cruelty against human children (*see* Davis, *History of Animal Protection*, *supra*).  Animal protection groups created broader "humane societies" that "safeguarded animals and children under a singular protected fold, positing that helpless 'beasts and babes' had a right to protection because they could suffer" (*id.*).  Historians saw these movements—toward abolition, animal rights, and child welfare—as moving in lockstep, through "an almost simultaneous development of antislavery sentiment, advocacy for animal welfare, diminished use of torture, and hostility to the use of corporal punishment to discipline children, prisoners, sailors, and women" (Priest, *supra*, at 148).

Other forces may have been simultaneously at work. Charles Darwin's *On the Origin of the Species*, published in 1859, established an evolutionary connection between humans and animals, and Darwin himself drafted legislation aimed at reducing animal suffering (Eric Michael Johnson, *Charles Darwin and the Vivisection Outrage*, Scientific American, Oct. 6, 2011, available at https://blogs.scientificamerican.com/primate-diaries/vivisection-outrage/#). Likewise, under a variety of late 19th century influences, "including transcendentalism, Theosophy, Buddhism, Hinduism and Darwinism, the concept of animals as rational, intelligent, and possessing souls that could survive bodily death gained popular acceptance" (A. W. H. Bates, *Have Animals Souls? The Late-Nineteenth Century Spiritual Revival and Animal Welfare*, in Anti-Vivisection and the Profession of Medicine in Britain: A Social History [2017], available at https://www.ncbi.nlm.nih.gov/books/NBK513717/).

Over the many decades thereafter, our societal norms toward animals have continued to change. As a simple example, in the 19th century, some animal welfare activists "maligned the cat as a semiwild killer of cherished songbirds" (Davis, *History of Animal Protection*, *supra*). By the 20th century, however, medical advances and inventions like the litter box brought cats out of the shrubbery and into the home (*id.*). The animal protection movement became focused on dogs, cats, and sheltering animals (*id.*), and today, cats are beloved by many in our society (*see* Roberto A. Ferdman & Christopher Ingraham, *Where Cats Are More Popular Than Dogs in the U.S.—And All Over the World*, Wash Post [July 28, 2014],

https://www.washingtonpost.com/news/wonk/wp/2014/07/28/where-cats-are-more-popular-than-dogs-in-the-u-s-and-all-over-the-world/).   Indeed, domesticated pets have become important members of families, and the law has accounted for the role they play in people's lives.  A recent New York law, for example, requires that a court managing a couple's separation, "in awarding the possession of a companion animal . . . consider the best interest of such animal" (Domestic Relations Law § 236 [d] [5]).  In many states, people can leave behind money for their pets or domesticated animals in trusts after they die (*see*, *e.g.*, New York Estates Power and Trusts Law § 7-8.1; Uniform Probate Code § 2-907 [b]; Breahn Vokolek, *America Gets What It Wants: Pet Trusts and a Future for Its Companion Animals*, 76 UKMC L Rev 1109, 1126-1128 [2008]).

Driving many of the changing social norms about wild animals is our vastly enhanced understanding of their cognitive abilities, needs and suffering when in captivity.  Prior to the 20th century, human understanding of animal intelligence was minimal.  Rather, humans regarded themselves as "unique in their sociality, individuality, and intelligence" (Piers Locke, *Explorations in Ethnoelephantology: Social, Historical, and Ecological Intersections between Asian Elephants and Humans*, 4 Envt & Socy 79, 79 [2013]).  As scientific research progressed in the 20th century, researchers began to discredit the notion of human exceptionalism.  Scientists found that animals such as apes, dolphins and elephants—like humans—had substantial capacity to engage in and maintain social relationships, to learn and transpose information, to "appreciate the thoughts and feelings of other sentient beings, and engage in strategic behavior" (*id.*).  Because human

understanding of the cognitive and emotional capacities of animals has developed recently and is still expanding, the contrast between what we now know and the paucity of information in earlier times must inform our analysis. What was unknown about animal cognizance and sentience a century ago is particularly relevant to whether Happy should be able to test her confinement by way of habeas corpus, because we now have information suggesting that her confinement may be cruel and unsuited to her well-being.

Philosophers have long debated the roles and capacities of animals in human society. French philosopher Michel de Montaigne contended that animals were conscious, rational, and moral—even more so than humans (Peter Harrison, *The Virtues of Animals in Seventeenth-Century Thought*, 59 J History of Ideas 463, 463 [1998]). Descartes posited the contrary; animals were not conscious, rational, or moral (*id.*). Nicolas Malebranche, a 17th-century French philosopher, described Descartes's understanding of animals: "[i]n animals there is neither intelligence nor souls as ordinarily meant. They eat without pleasure, cry without pain, grow without knowing it, desire nothing, fear nothing, and know nothing" (Steven Nadler, The Cambridge Companion to Malebranche 42 [2000]). Descartes's dogmatic belief that animals were insentient, unfeeling beings was not ubiquitously accepted. Rather, theories of the virtues and capabilities of animals varied significantly prior to the 20th century (Harrison, *supra*, at 471). Some accepted Montaigne's expansive view of animal consciousness, and others rejected it, instead following Descartes's views (*id.*). Some found a middle ground that reflected Aristotle's

view: animals were conscious and sentient but had no rational soul (*id.*). None of those views were firmly grounded in anything we would describe as the scientific method.

Today, human understanding of the cognitive and emotional makeup of animals is meaningful and sound, though surely incomplete. The panoply of undiscovered information and broad scope of recent findings support approaching the question of animal sentience, feeling and confinement with humility and deference to the unknown. Indeed, "it is always advisable to perceive clearly our ignorance" (Charles Darwin, The Expression of the Emotions in Man and Animals 66 [1872]). The past century has given rise to substantial developments in the scientific understanding of animals, suggesting also that there remains much that we still do not know.

As to elephants in particular, in 1957, scientists at a zoo in Germany conducted several experiments to determine the mental capabilities of elephants (B. Rensch, *The Intelligence of Elephants*, Scientific American 196(2), 47 [1957]). The researchers found that elephants were able to recognize visual and auditory patterns, associate symbols with rewards and detriments and anticipate consequences of their actions (*id.* at 47-48). Even when patterns were altered, elephants were nonetheless able to recognize them. That behavior, researchers noted, demonstrated elephants' ability to "transpose learning or form an abstract concept" (*id.*). Elephants' substantial mental capacity was similarly demonstrated by researchers' discoveries regarding elephant memory. Researchers found that elephants were able to remember distinctions between various sounds or visual patterns one year after they had initially learned them (*id.* at 48). The research established

that elephants bear very substantial mental cognizance; they can "anticipat[e] what will come of certain actions" and have the capacity for "true ideation" (*id.* at 47).

Beyond the ability to recognize and respond to patterns, elephants have exhibited complex social behaviors and have substantial ability to engage in and maintain social relationships (George Wittemyer, The Global Guide to Animal Protection: Perceptions of Elephants 90 [2013]). Studies have shown that elephant families are headed by matriarchs, who "lead[] their families through a vast social network where relations and dominance have been worked out among hundreds of individuals" (*id.*). Other research has detailed elephants' abilities to develop meaningful social and familial bonds (*id.*). Elephant mothers whose calves perish will often mourn their loss for days, attempt to revive the dead and stand guard over the body for days at a time (*id.*). Elephants' ritualistic funeral practices further offer support for the notion that they are mentally and socially complex beings: when a member of an elephant family dies, elephants have been seen gathering around the deceased, smelling, moving and interacting with the deceased's bones (*id.*). The motivation behind elephant funeral practices remains unknown (though a visitor from another planet might say the same about human funeral practices) and is representative of the incompleteness of human knowledge regarding animal behavior.

Human understandings of elephant cognition are continuously developing and therefore are far from absolute. Just a decade ago, scientists learned that elephants had the ability to engage in "insightful problem solving" because they demonstrated substantial capability to use tools (Preston Foerder et al., *Insightful Problem Solving in an Asian*

*Elephant*, PLoS One 6(8), 5 [2011]). Fewer than 20 years ago, scientists determined that elephants were likely self-aware because they were able to recognize themselves in a mirror. Happy herself was a subject of that experiment. She exhibited behavior consistent with mirror self-recognition—an ability that remains "exceedingly rare in the animal kingdom" (Joshua M. Plotnik et al., *Self-Recognition in an Asian Elephant*, PNAS 103(45), 17053 [2006]).

Today, we would roundly reject Descartes's claim that animals "cry without pain . . . desire nothing, fear nothing and know nothing." Indeed, it is the advancing state of our knowledge that has led us to provide rights to animals. The idea of a habeas petition on behalf of an elephant would have seemed ludicrous to Descartes, who saw animals as inanimate, insentient objects. Given what we know today, it would be even more absurd to allow Descartes's views to factor into a decision concerning Happy's ability to seek relief through habeas corpus, when human understanding of elephant cognition, social behavior, capabilities and needs demonstrates the absurdity of those ancient, uninformed views. Due to our greater understanding of animals, we have also increasingly recognized that harms to animals outweigh the benefits to humans from various forms of animal uses and confinements once commonplace. The Zoo itself has decided that it will not acquire any elephants in the future, so that Happy will be one of the last elephants to inhabit the Zoo (Tracy Tullis, *The Bronx Zoo's Loneliest Elephant*, NY Times [June 26, 2015], https://www.nytimes.com/2015/06/28/nyregion/the-bronx-zoos-lonliest-elephant.html]). In 2015, the Ringling Brothers Barnum & Bailey Circus announced it would cease using

elephants in its acts by 2018 (Richard Pérez-Peña, *Elephants to Retire From Ringling Brothers Stage*, NY Times [Mar. 5 2015], https://www.nytimes.com/2015/03/06/us/ringling-brothers-circus-dropping-elephants-from-act.html).  The circus shut its operations entirely in 2017, and just about a month ago announced that it would return, but with no animals whatsoever as part of the show (Sarah Maslin Nir, *Ringling Circus Is Returning. Lions, Tigers and Dumbo Are Not*, NY Times [May 18, 2022], https://www.nytimes.com/2022/05/18/arts/ringling-circus-returning.html).  Even if the circus made its decision because potential customers think it cruel to see an elephant doing tricks, the views of those potential customers are shaped by a better understanding of elephants.  The law has reflected those evolving social norms.  Today, a pediatrician who suspects that a child has been abused must report her suspicion; a veterinarian who suspects that an animal has been abused must do the same; and the abusers of either are subject to criminal prosecution.

The question presented by Happy's case—whether she should be able to challenge the conditions of her confinement through a writ of habeas corpus—arises within our country's history of evolving norms and knowledge about animals.  Those evolving norms and our deepening understanding about animals, along with legal developments that reflect them, provide the essential context for deciding this case.

B

As the Zoo's treatment of Mr. Benga illustrates, however, comparisons between animals and enslaved and non-white people have been used perniciously.  Those

comparisons have occurred in at least two ways:  first, non-white and enslaved people were directly equated with animals in ways that justified oppression or enslavement, and second, animal rights advocates have likened animal captivity to human enslavement and the violence of colonization in ways that, intentionally or not, further dehumanize non-white and indigenous people.  The first comparison shocks our conscience today.  The second comparison trivializes the particular, acute and morally destitute nature of human slavery, distracting from more nuanced and helpful reflections on the insight that slavery and colonization may have for other kinds of subordination.

Any discussion of slavery in the context of animal rights demands an acknowledgment of our country's reprehensible history of denying the humanity of racial minorities.  I opened with a small fragment of the outrageous story of Mr. Benga, whom the Zoo placed on display in a cage with an orangutan (*see* Pamela Newkirk, Spectacle: The Astonishing Life of Ota Benga 26 [2015]).  Mr. Benga's confinement, which should enrage us today, was welcomed as an opportunity for visitors to see a Black man deemed less human than the gawking white visitors, at least some of whom felt uneasy with the display (*id.* at 9).  When Mr. Benga was first exhibited, at the 1904 St. Louis World's Fair along with other people from his part of the Congo, the Fair also included a miniature village filled with people from the Philippines, whom newspapers of the day described as "savages" comparable to monkeys (*see* Wash Post, *How a Monkey Got In: Was Mistaken for One of the Igorrote Babies*, May 2, 1904 at 5; Henry Grady, *Philippine Village— Startling Exhibit at Fair: Igorrotes in Native Attire, Celebrate Holidays by Diet of Dog*

*Meat; Strange Customs and Queer Practices*, Atlanta Constitution [July 3, 1904], at B5).

That historical practice of equating non-white people to animals was pervasive. Indeed, the practice—termed "animalization" by some—was used to justify the slavery of Africans and people of African descent and avoid any emotional empathy white society might feel for the people whose liberty it stole (*see* Luis C. Rodrigues, *White Normativity, Animal Advocacy, and PETA's Campaigns*, 20 Ethnicities 71, 77 [2020]).

Advocacy by organizations pushing for animal rights has at times drawn comparisons to human slavery that exacerbate the "animalization" of non-white people. In 2005, the People for the Ethical Treatment of Animals (PETA) ended a campaign due to criticism of its alleged comparisons between the treatment of enslaved Black people and animals (Angela Harris, *Should People of Color Support Animal Rights?*, 5 J Animal L 15, 18-19 [2009]). The campaign provoked a response from the NAACP, which inquired, "Is PETA saying that as long as animals are butchered for meat, racists should continue lynching Black people?" (*id.* at 19).[11] Such advocacy evoked harmful stereotypes of racially oppressed communities as less-than-human (*see id.*), making members of those

---

[11] PETA's messaging frequently contained comparisons of animals to nonwhite humans. In 2005, PETA announced an exhibit it would bring to Los Angeles on "Animal Liberation" (Angela Harris, *Should People of Color Support Animal Rights?*, 5 J Animal L 15, 21 [2009]). The exhibit would juxtapose images of cruelty to humans that was once accepted by society with images of current cruelty to animals that society condoned (*id.* at 21). Other PETA exhibits include one titled "Are Animals the New Slaves?" (Luis C. Rodrigues, *White Normativity, Animal Advocacy, and PETA's Campaigns*, 20 Ethnicities 71, 74 [2020]). PETA once displayed a photo of a Black man being lynched beside an image of a cow hanging upside down by its feet mid-slaughter (*id.*).

communities hesitant to join advocacy efforts on behalf of animals (*see* Harris, *supra*, at 24-27).

The comparisons drawn between animals and enslaved and non-white people—evident from early American history through PETA's campaigns in the 21st century—require great caution in articulating rights of animals. Discussions that involve both animal rights and racial oppression should not equate the suffering of animals with the suffering of enslaved, colonized or subjugated humans. Scholars who have criticized animal rights activists' harmful messaging have also identified a path forward, offering alternative bases for supporting animal rights in anti-racist ways. Those alternative bases include a framework oriented against subordination broadly within the industrialization of our economy, as well as a lens drawing from the heritage of positive animal treatment in indigenous communities prior to colonization (*id.* at 28-29).

Most importantly, by moving away from questions of animal "personhood"—through a clear statement that animals are not humans—we can focus on questions about our capacity for empathy toward other beings and the expansion of the rights we have granted them, while also avoiding comparisons that have harmful racial-coding and dehumanizing effects (*see id.* at 31-32). Frederick Douglass, once enslaved himself, explained that "[t]here is no denying that slavery had a direct and positive tendency to produce coarseness and brutality in the treatment and management of domestic animals, especially those most useful to the agricultural industry" (Frederick Douglass, Address Delivered at the Third Annual Fair of the Tennessee Colored Agricultural and Mechanical

Association 12-13 [1873]).  Douglass urged his audience that "[i]t should be the study of every farmer to make his horse his companion and friend, and to do this, there is but one rule, and that is, uniform sympathy and kindness" (*id.* at 13).  He specifically pointed to the similarities between animals and humans:

> "A horse is in many respects like a man.  He has the five senses, and has memory, affection and reason to a limited degree. When young, untrained and untamed, he has unbounded faith in his strength and fleetness.  He runs, jumps and plays in the pride of his perfections.  But convince him that he is a creature of law as well as of freedom by a judicious and kindly application of your superior power, and he will conform his conduct to that law, far better than your most law-abiding citizen" (*id.*).

The Great Writ's purpose calls for exactly that:  a judicious and kindly application of superior power.

## IV

The law, at its core, reflects normative judgments about the behaviors we want to allow, encourage, discourage or prohibit.  In this way, the law reflects our society's values and aspirations.  Criminal law, for example, delineates the conduct we deem most harmful and the penalties for engaging in those acts.  Our law of contracts reflects how we think people or organizations should engage and make promises with one another and the circumstances in which such promises will be enforced.  Our law of torts reflects which acts are wrongful or infringe on someone's rights and give the harmed person a civil remedy, usually through damages.

Because the law reflects our society's values, the law inevitably changes as those values change. Indeed, *to change* is a function of the law: "Law must be stable, and yet it cannot stand still" (Roscoe Pound, Interpretations of Legal History 1 [1923]). It is impossible for the law to remain static; as society changes, the law accommodates those changes, at minimum considering how the law as it exists applies to novel situations and changes in society, and sometimes shedding ancient decisions or creating new legal doctrines to accommodate new knowledge, beliefs and challenges. The law and social norms, then, are constantly in conversation with one another; oftentimes changes in social norms lead to changes in the law; other times, the law changes in attempt to adjust the prevailing social norms. "The moral code of each generation, this amalgam of custom and philosophy and many an intermediate grade of conduct and belief, supplies a norm or standard of behavior which struggles to make itself articulate in law. . . . The same pressure is at work in making the law declared by the Courts" (Benjamin N. Cardozo, The Paradoxes of Legal Science 17 [1928]).

As its history shows, the writ of habeas corpus was used flexibly to address myriad situations in which liberty was restrained. It is a common law writ and, although different in the respect that the legislature cannot alter its scope, its judicial implementation mirrors the path generally used by courts to adapt the common law and conform it to present times. In that regard, habeas corpus is just one example of how courts alter conduct as societal needs, values and aspirations evolve.

The decisions of our Court during the time of Chief Judge Cardozo have long been used as textbook illustrations of how a court changes the common law to adapt it to the changed needs and wants of society, without waiting for a legislature to act. A prime illustration is *MacPherson v Buick Motor Company* (217 NY 382 [1916]), described by Chief Judge Judith Kaye as an opinion that "breathes with the elasticity and forward progress of the common law" (Judith S. Kaye, *Benjamin Nathan Cardozo*, Historical Society of the New York Courts, https://history.nycourts.gov/biography/benjamin-nathan-cardozo/ [June 3, 2022]). In *MacPherson*, our Court considered a negligence claim raised by a driver against a manufacturer of automobiles (217 NY at 384-385). Under longstanding common law, the plaintiff could not sue the manufacturer of the defective wheel that caused the accident because the plaintiff was not "in privity" with the wheel manufacturer—that is, they had no business relationship. Citing the limited exceptions to the privity rule, involving inherently dangerous items like "poisons, explosives, [and] deadly weapons" (*id.* at 387), Judge Cardozo extracted from those the broader principle that "[i]f the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger" and if the manufacturer has "added knowledge that the thing will be used by persons other than the purchaser," then irrespective of privity, "the manufacturer of this thing of danger is under a duty to make it carefully" (*id.* at 387-388). Applying that new rule to the *MacPherson* plaintiff's case, the Court held that the defendant manufacturer owed the plaintiff a duty, as "the nature of an automobile gives warning of probable danger if its construction is defective" and because the manufacturer "knew [] that the car would be used by persons other than the buyer" (*id.*

at 390-391).  In adapting the common law Judge Cardozo "plow[ed] through a line of cases

generally recognized as exceptions to the general no-liability-without-privity rule" to

create a new principle:  "Foresight of danger creates a duty to avoid injury" (Judith S. Kaye,

*Benjamin Nathan Cardozo*, *supra*).  Judge Cardozo famously explained how societal

changes require modification of the common law:

> "Precedents drawn from the days of travel by stage coach do not fit the conditions of travel to-day.  The principle that the danger must be imminent does not change, but the things subject to the principle do change.  They are whatever the needs of life in a developing civilization require them to be" (*MacPherson*, 217 NY at 391).

Numerous other cases showcase that same innovation to meet current needs and

understandings.  For example, in *Wood v Lucy, Lady-Duff Gordon* (222 NY 88 [1917]),

one of the "most significant contract cases" (Historical Society of the New York Courts,

*There Shall Be a Court of Appeals* 60 [1997], https://history.nycourts.gov/wp-

content/uploads/2018/11/History_COA-Kaye-There-Shall-Be.pdf), Judge Cardozo held

that the promise to undertake and perform the terms of a contract may be implied even if

not expressly included in the contract (*Lucy*, 222 NY at 91).  In so holding, he observed

that "[t]he law has outgrown its primitive stage of formalism when the precise word was

the sovereign talisman, and every slip was fatal" (*id.*).  Instead, "[i]t takes a broader view

today":  "A promise may be lacking" by the express terms of a contract, "and yet the whole

writing may be 'instinct with an obligation,' imperfectly expressed.  If that is so, there is a

contract" (*id.* [citations omitted]).  In *Palsgraf v Long Island Railroad Co.* (248 NY 339

[1928]), "[p]erhaps the most famous torts opinion written during the 20th century" (*There*

*Shall Be a Court of Appeals*, *supra*, at 66), Judge Cardozo clarified that in negligence actions, "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others *within the range of apprehension*" (*Palsgraf*, 248 NY at 344 [emphasis added]). *Palsgraf* moved negligence common law away from a strict analysis of proximate cause between harm and injury. His decision arose in the context of increasing industrialization, high accident rates and "competing paradigms of liability" (William E. Nelson, Palsgraf v. Long Island R.R.*: It's Historical Context*, 34 Touro L Rev 281, 286 [2018]), responding to the need for clarity in the law given the changes in society.

Even recently, we have recognized our duty to adapt the common law to present circumstances, without waiting for the legislature. Just last year, in *Greene v Esplanade Venture Partnership* (36 NY3d 513 [2021]), we adjusted the common law in response to changed notions on what it means to be part of a family. For several decades, during which the legislature had not acted, the common law restricted persons within the "zone of danger" when another was killed or injured, who could recover for emotional distress, to plaintiffs who belonged to the victim's immediate family. Although existing case law denied recovery to a woman who had been raised by her aunt, we expanded the definition of "immediate family" to include grandparents, pointing to the "increasing legal recognition of the special status of grandparents, shifting societal norms, and common sense," allowing the grandmother to recover for her emotional distress (*id.* at 516).

Our Court has a long and distinguished history of adapting the common law to reflect new knowledge, changed beliefs and economic and social transformations.  "During its first 150 years, the New York Court of Appeals has had more impact on more areas of law than any other court in the United States" (*There Shall Be a Court of Appeals*, *supra*, at 56).  We "act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice" (*Woods v Lancet*, 303 NY 349, 355 [1951]).  Not all change can or should come from the legislature; we "abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule" (*id.*).  Indeed, "[h]ardly a rule of today but may be matched by its opposite of yesterday.  . . .  These changes or most of them have been wrought by judges [who] . . . used the same tools as the judges of today.  . . .  The result . . . has been not merely to supplement or modify; it has been to revolutionize and transform" (Benjamin N. Cardozo, The Nature of the Judicial Process 26-28 [1921]).

In *Hynes v New York Central Railroad Co.* (231 NY 229 [1921]), Judge Cardozo considered whether a railroad company could be liable for the death of a boy who jumped from a plank or springboard projecting from the company's bulkhead above a river—a practice common among boys swimming in the area.  In ruling in favor of the boy, Judge Cardozo criticized the arguments raised by the railroad company:

> "Liability, it is said has been escaped because the pole was horizontal.  The plank when projected lengthwise was an extension of the soil.  We are to concentrate our gaze on the private ownership of the board.  We are to ignore the public ownership of the circumambient spaces of water and of air.  Jumping from a boat or a barrel, the boy would have been a

> bather in the river. Jumping from the end of a springboard, he was no longer, it is said, a bather, but a trespasser on a right of way. Right and duties in systems of living law are not built upon such quicksands" (*id.* at 233).

The judges, Justice Paine among them, who issued writs of habeas corpus freeing enslaved persons, or liberating women and children from households run by abusive men, or ordering the return home of underaged soldiers could have said, as the majority does here, "that's a job for the legislature." They could have said, "existing law offers some protections, and we dare not do more." They could have said, "we can't be the first." But they did not. None of those declamations is remotely consistent with our Court's history, role or duty. Where would we or Judge Cardozo be, had he declined to act for any of those reasons? The Great Writ's use, as a case-by-case tool to probe whether the law may need to adapt, is part of the fundamental role of a common-law court to adapt the law as society evolves.

## V

Supreme Court denied Happy's petition for a writ of habeas corpus on the ground that it was bound by Appellate Division law holding that animals have no rights because they cannot bear responsibilities. If they have no rights, they have nothing to enforce by habeas corpus. As discussed above, that legal proposition is erroneous. The next question is, what is the standard to be used to determine whether Happy has made out a prima facie case in her petition, which would entitle her to a determination of her petition on the merits? In other words, did Happy present sufficient information through her complaint and

supporting affidavits to entitle her to a full hearing? The ultimate question—should Happy be granted a transfer out of the Zoo and into a residence better suited to her needs—is not before us. Supreme Court did not attempt to resolve disputed issues of fact, but instead dismissed the case as a legal impossibility. I would hold that Happy has sufficiently stated a prima facie case entitling her to a hearing, and remit for Supreme Court to weigh the evidence, resolve conflicting issues and render a merits decision.

## A

Happy's habeas petition should not have been summarily dismissed. As I discussed earlier, the dismissal of her petition was based on an erroneous Appellate Division decision that said habeas corpus in New York was restricted to humans because only humans can hold rights. The prior sections of my writing underscore that habeas is not so limited and instead has always been used to challenge confinement at the boundaries of evolving social norms, even by petitioners with the legal status of chattel (enslaved persons) or no legal identity or capacity to sue on their own (wives and children).

As a threshold matter, we must review Happy's case under the liberal standard of review afforded to cases that are appealed from motions to dismiss (CPLR 3211 [a] [7]). Thus, we must "accept[] the facts as alleged in [Happy's] complaint [and supporting affidavits] as true" and accord Happy "the benefit of every possible favorable inference" (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]; *Morone v Morone*, 50 NY2d 481, 484 [1980]; *Rovello v Orofino Realty Co., Inc.*, 40 NY2d 633, 634 [1976]).

To begin, Supreme Court did make a factual finding, undisturbed by the Appellate Division, that "Happy is an extraordinary animal with complex cognitive abilities, an

intelligent being with advanced analytic abilities akin to human beings" (2020 WL 1670735, at *3 [Sup Ct, Bronx County, Feb. 18, 2020]).

Next—taking the information Happy has submitted as true, and granting every possible reasonable inference in her favor—what do we know about her? We know that Happy is a 48-year-old Asian elephant who was captured in the wild and brought to the United States when she was just one year old. She arrived at the Bronx Zoo in 1977, along with an elephant named Grumpy. Happy was on display for visitors, gave some of them rides and participated in "elephant extravaganzas." She lived with Grumpy for a long 25 years, but after the Zoo had Happy and Grumpy live with two other elephants, Patty and Maxine, in the same exhibit, those two elephants attacked Grumpy. Grumpy was so severely injured that the Zoo decided to euthanize her. The Zoo then separated Happy from Patty and Maxine, who had attacked her companion. They later introduced Sammie, a younger female Asian elephant, into Happy's part of the exhibit, but Sammie's severe liver disease led to the Zoo euthanizing her as well. Ever since Sammie died in 2006, Happy has been living alone at the Bronx Zoo, in a one-acre enclosure.

Accepting as true the (largely unchallenged) expert affidavits submitted on behalf of Happy, we also know that Happy and elephants like her "possess complex cognitive abilities" of a great number. Among those myriad qualities and abilities include "autonomy; empathy; self-awareness; self-determination; theory of mind (awareness that others have minds); insight; working memory; [and] an extensive long-term memory that allows them to accumulate social knowledge." They are able to "act intentionally and in a goal-oriented manner," "understand the physical competence and emotional state of

others," "engage in true teaching," "cooperate and build coalitions," engage in "cooperative" and "innovative problem-solving," "understand causation," and engage in "intentional communication." They have "complex learning and categorization abilities," and they understand death, practicing grieving behaviors that "are akin to human responses to the death of a close relative or friend" when they have lost a companion.

Happy herself is the first elephant to pass the "mirror self-recognition-test", meaning she was able to recognize her reflection in the mirror as herself. Passing that test is "thought to correlate with higher forms of empathy and altruistic behavior." Those qualities suggest Happy has a level of autonomy, intelligence and understanding that could make suffering particularly acute. She knows that Grumpy died, she understands that her life progresses sequentially, and she is aware that she is alone.

Next—again taking the information Happy has submitted as true, and granting every possible reasonable inference in her favor—what do we know about her confinement? We know that elephants are "social species who suffer immensely when confined in small spaces and deprived of social contact with other members of their species." Isolation leads to depression, boredom, aggression, and a failure to thrive, and human caregivers cannot substitute for the complex relationships that elephants like Happy are able to build with peers from their own species. Bolstering the scientific research, videos of Happy show her engaging in just five activities or behaviors: dusting, grazing on grass, standing and facing the fence or gate, swinging her trunk, and standing with one or two feet lifted off the ground, which could possibly be to ease the weight off painful, diseased feet. Of those five activities, only two—dusting and eating grass—are considered normal. In the wild,

elephants are active more than 20 hours a day, traversing miles and miles to feed themselves, to find friends and to mate. When they are confined, they can develop arthritis and osteoarthritis. The favorable inference to draw, then, is that Happy's habitation at the Bronx Zoo—a living environment that has kept her without any engagement with other elephants since 2006 and that is a miniscule fraction of the size of elephants' typical environments—is causing her deep physical and emotional suffering because it is so unnaturally different from conditions that meet the needs of elephants (*see* Martha C. Nussbaum, *Working with and for Animals: Getting the Theoretical Framework Right*, 94 Denv L Rev, 609, 624 [2018] ["Each creature, then, deserves ethical consideration for what it is, and a kind of constitution that specifies what harms it should not be permitted to suffer-not in terms of its likeness to humans or its possession of some least-common-denominator property, but in terms of what it is itself, the form of life it leads"]).

Finally, given what the information Happy has submitted reveals about how she experiences the world as an elephant and about her environment at the Bronx Zoo, has Happy made a prima facie showing of possible unjust confinement that grants her a full hearing to decide the merits of her habeas petition? She has. If we accept all of the information as true, Happy is a being with highly complex cognitive, social and emotional abilities. She has self-awareness, social needs and empathy. She also comes from a wild, highly social species whose bodies and minds are accustomed to traversing long distances to connect with others and to find food. Happy has established a prima facie case that her confinement at the Bronx Zoo stunts her needs in ways that cause suffering so great as to be deemed unjust.

The majority is gravely concerned that allowing Happy to have her habeas corpus petition adjudicated on the merits "would have an enormous destabilizing impact on modern society" (majority op at 12). The majority worries that allowing Happy to invoke habeas corpus would risk the "disruption of property rights, the agricultural industry (among others), and medical research efforts" and "followed to its logical conclusion . . . call into question the very premises underlying pet ownership, the use of service animals, and the enlistment of animals in other forms of work" (*id.* at 12-13). Certain amici have contended that allowing Happy to present the merits of her habeas corpus claim would end dairy farming, result in neighbors filing habeas petitions to free domestic dogs and cats, and put children with ant farms to the task of responding to habeas petitions in court. These scenarios are so facially preposterous that they hardly deserve a response; it is also difficult to know which of many possible responses to offer.

First, the majority's parade of horribles would arise from "a 'sweeping pronouncement[]' of nonhuman animal personhood" (*id.* at 15). But I reiterate: Happy is not a person. Happy is an elephant. Elephants do have an interest in liberty and have been granted rights against inhumane treatment. Whatever rights and interests Happy may have do not tell us anything about the rights my dog has. The majority complains that granting legal personhood and liberty rights to Happy "would not be an incremental step in 'the slow process of decisional accretion'" regarding the scope and flexibility of the writ of habeas (*id.* at 12), but granting a single elephant—not the whole animal kingdom—the right to a full hearing on a writ of habeas corpus is about as incremental as one can get.

Second, Happy is not a domestic animal; she is a wild animal. A domestic animal would not be able to make out a sufficient prima facie showing, principally because domestication is part of its makeup, and domestication implies confinement. In the case of domestic animals, by definition, their habitation with their owners is something aligned with their genetic dispositions (*see* Natasha Daly, *Domestic Animals, Explained*, National Geographic [July 4, 2019], available at https://www.nationalgeographic.com/animals/article/domesticated-animals [accessed June 9, 2022]; Brian Hare and Vanessa Woods, *We Didn't Domesticate Dogs; They Domesticated Us*, National Geographic [March 3, 2013], available at https://www.nationalgeographic.com/animals/article/130302-dog-domestic-evolution-science-wolf-wolves-human). Domestic animals are genetically distinct from their wild ancestors or cousins, a process that takes generations of selective breeding (*see* Daly, *supra*). They are fundamentally different from animals like Happy.

Third, if an ant in an ant farm could establish the same showing that Happy has, the ant would be entitled to a hearing. But at least based on present knowledge, an ant cannot possibly make such a showing. Happy is not a human, and an ant is not an elephant. As illustrated by my analysis of whether Happy made a prima facie showing that a writ of habeas corpus should issue to entitle her to a merits hearing, whether a being can invoke habeas is highly case-specific. I first asked, "what does the information submitted by the petitioner tell us about the petitioner?" In Happy's case, it showed us she is extremely cognitively complex and comes from a highly social, empathetic species of wild animals. Those qualities of elephants make them unique in the animal kingdom, meaning the answer

to the question for earthworms, domesticated pets, service animals and many animals subject to medical research, would be entirely different. The second question I asked was, "what does the information submitted by the petitioner tell us about the confinement?" In Happy's case, it showed (in the light most favorable to her) that her habitation at the Zoo was causing extreme suffering by depriving her of social interaction with other members of her species and by significantly truncating the amount of space she typically would be able to traverse.

Fourth, common-law courts are especially good at developing doctrines to deal with slippery slopes. Proximate cause, reasonableness and foreseeability are among the many doctrines that courts use to stop principles from reaching their logical conclusions. For example, in our recent decision in *Greene* we extended to a grandmother within the zone of danger tort recovery for emotional distress. The "logical conclusion" would be that anyone suffering emotional distress from seeing or hearing about a tortious injury to anyone should be able to recover, but by employing a "within the zone of danger" test and an "immediate family member" test, we firmly controlled the slope's slipperiness.[12]

---

[12] The majority complains that a balancing test of rights and interests would result in a "morass of confusing case-by-case inquiries apparently to be determined by some subjective, amorphous, and evolving 'normative' value system" (majority op at 14)—but, as the historic and flexible use of habeas I describe in section II shows, that is exactly its character: the writs issued by the King's Bench were indeed determined by a subjective, amorphous and evolving normative process. I do take issue with the idea that case-by-case determinations of competing rights and interests is a "morass"—it is the bread and butter of what courts do (*see*, *e.g.*, *Keenan v Gigante*, 47 NY2d 160, 163 [1979] ["We are called upon in this case to balance the weighty considerations of society's right to expose criminal improprieties within the New York City Department of Correction and a priest's solemn obligation to assist those who beckon for his guidance and help in the utmost

The common law, of which the Great Writ is a part, determines the scope incrementally, on a case-by-case basis. "If you ask how [a judge] is to know when one interest outweighs another, I can only answer that he must get his knowledge just as the legislator gets it, from experience and study and reflection; in brief, from life itself" (Cardozo, Nature of the Judicial Process, *supra*, at 113). Even were Supreme Court to determine that the balance favored transferring Happy to a sanctuary, that would not mean, for example, that elephants living in the San Diego Zoo's 1,800-acre safari park, in the company of other elephants and wildlife, would succeed on the merits of a habeas petition (*see* San Diego Zoo Wildlife Alliance, San Diego Zoo Safari Park 2022 Fact Sheet, https://sandiegozoowildlifealliance.org/pressroom/safari-park-press-kit-fact-sheet-2022 [accessed June 9, 2022]). Each subsequent case would define the contours of the common law, whatever the result—which is the enduring genius of the common law.

---

confidence"]; *Rivera v Smith*, 63 NY2d 501 [1984] [balancing the right of free exercise of religion with the interest in prison safety]; *159 MP Corp. v Redbridge Bedford, LLC*, 33 NY3d 353, 360-361 [2019] ["(W)e may void an agreement only after 'balancing' the public interests favoring invalidation of a term chosen by the parties against those served by enforcement of the clause and concluding that the interests favoring invalidation are stronger"]; *Espinal v Melville Snow Contractors*, 98 NY2d 136, 138 [2002] ["As we have often said, the existence and scope of a duty is a question of law requiring courts to balance sometimes competing public policy considerations"]; *Brown v Kingsley Books, Inc.*, 1 NY2d 177, 188-189 [1956] ["balancing the several competing interests involved" to determine obscenity]). Similarly, the majority's complaint that a case-by-case determination would depend "on a judge's subjective determination of where the relator would be 'better off'" (majority op at 13) is the standard our courts apply when determining custody over human children, for example, and is exactly the standard used in adjudicating writs of habeas corpus brought on behalf of children in the 17th and 18th centuries.

Finally, allowing Happy to have a habeas corpus hearing does not mean that any other elephant would automatically be entitled to file a habeas petition and receive a full merits hearing or would prevail at one. Unlike changes to common-law doctrines wrought through civil cases, habeas corpus is inherently a case-by-case process. When the King's Bench granted the habeas petition of James Sommersett, abolitionists cheered (Halliday, *supra*, at 175). They hoped the habeas grant could lead to movement toward eradicating slavery across England; but, "they would [] be disappointed" (*id.*). Despite the fact that thousands of people in England at that time were enslaved, "no rush for writs to release them followed" the grant in Mr. Sommersett's case (*id.*). As "[h]abeas corpus, by its nature, could not enable a judge to declare illegal an entire system of bondage," the following year only two enslaved persons received freedom during habeas corpus proceedings—and through settlement agreements, not through merits decisions. In other cases, judges denied the habeas petitions of enslaved people for various reasons (*id.*). Likewise, the *Lemmon Slave Case* freed only the eight family members who petitioned in that case. It did not end slavery and did not produce a flood of follow-on habeas petitions. The several habeas corpus petitions freeing women from abusive husbands or relocating children to better custodians also caused no great flood of filings. But if *Sommersett's Case*, the *Lemmon Slave Case* or the cases involving women and children had produced a flood of habeas petitions freeing victims of unjust confinement, would history view them with disapproval?

B

Because I conclude that Happy is entitled to a merits hearing on her habeas corpus petition, I should address what that hearing would entail. Although Happy presented myriad information showing that her confinement is unjust, the Zoo submitted contrary information, also from experts, denying some of the claims made by Happy's experts and opining that Happy might be worse off in a sanctuary than she is now.

The Zoo submitted information to show that Happy is well taken care of in her current habitation. Her appetite, food intake, stool appearance and quantity, overall activity, and responsiveness to human keepers are monitored consistently. She receives daily baths, activities for mental and physical stimulation, and positive reinforcement training sessions. She also receives periodic blood draws, trunk washes and weigh-ins to monitor her health. She can access an outdoor space at night if she wishes. Patrick Thomas, Vice President and General Curator of the Wildlife Conservation Society (WCS) and Associate Director of the Zoo, stated that Happy is comfortable with her keepers and recognizes her surroundings as a "familiar, longstanding environment." He concluded that "suddenly taking her away from this environment and introducing entirely new surroundings without the support of her keepers could inflict long-term damage on Happy's welfare." He also stated that Happy has not responded well in the past to short, temporary moves within the Zoo. Paul P. Calle, another WCS Vice President who also serves as the Chief Veterinarian and Director of the Zoological Health Program, stated that he believes Happy is healthy and well-adapted to her environment. Dr. Calle reiterated Mr. Thomas's concerns that Happy became distressed during short moves from one part of the Zoo to

another and opined that release to a sanctuary would cause "substantial stress" to Happy and pose a "serious risk to her long-term health."  In response to these arguments, the Nonhuman Rights Project (on behalf of Happy) submitted other affidavits and information rebutting WCS's points and underscoring the appropriate nature of a sanctuary for Happy. Reconciling the mass of conflicting evidence is the kind of factfinding for which a trial court is well equipped.  (Indeed, the majority's suggestion that legislatures might be better suited to this sort of fact intensive evaluation of conflicting evidence is counter to the roles of courts and legislatures.)

Once a court is engaged in a merits analysis of a habeas petition, it must undertake a normative analysis that weighs the value of keeping the petitioner confined with the value of releasing the petitioner from confinement.  The value of the confinement would include not just the value of the confinement to Happy (*e.g.*, superior medical care), but also the value of the confinement to the captor and society.  In Happy's case, the value of the confinement to the Zoo and to society appears low or nonexistent:  the Zoo decided in 2006 that it would end its elephant program, meaning it would accept no new elephants into the zoo.  That decision strongly suggests that, whereas the value to the Zoo and society in displaying an elephant might have been substantial long ago, today that value is negligible, while at the same time (and relatedly), our appreciation for the fundamental qualities, abilities and needs of elephants has led us to understand the damage done to them by confinement in close, companionless quarters.

## VI

Each of the following propositions is firmly established in the legal history of the Great Writ. Even were Happy chattel—which she is not—the writ may be used to address confinement of living beings deemed chattel. The fact that Happy is an animal does not prevent the law from granting rights to her. That positive law already provides Happy some rights does not restrain the writ. That positive law says the Zoo has control over Happy does not restrain the writ. That Happy cannot be released, but seeks transfer to a more suitable custodial situation, does not render the writ unavailable. That Happy would be the first animal able to test confinement by a writ of habeas corpus in our country does not render the writ unavailable. Allowing Happy to proceed by habeas corpus would not destabilize modern society; it would not even guarantee Happy's transfer, would not entitle any other elephant's release or transfer, and would not entitle any other type of animal to proceed by habeas corpus.

Those propositions establish that our Court could reverse and allow Happy to proceed by writ of habeas corpus—that the various rationales offered by the majority for affirming are wrong. Why we should reverse is a different question. The simplest answer is because the legal basis for denying the writ—that animals cannot have rights because they cannot bear responsibilities—is wrong. When a decision below has been made under an incorrect legal standard, that alone is sufficient to require reversal and remittal.

The fuller answer is that the evidence tendered by Happy demonstrates that Happy has very substantial cognitive, emotional and social needs and abilities, and that those

qualities coupled with the circumstances of her particular confinement establish a prima facie case that her present confinement is unjust. That showing is consistent with the kind of showings made by abused women and children and enslaved persons. That does not mean Happy would prevail; the Zoo has raised substantial arguments, coupled with competing evidence, that the proposed transfer would be harmful to Happy. We are not a factfinding court, and I would not presume that we should decide Happy's fate, but we should hold that she has a right to have a factfinding court determine it.

The fullest answer, though, is that we should recognize Happy's right to petition for her liberty not just because she is a wild animal who is not meant to be caged and displayed, but because the rights we confer on others define who we are as a society. Our erudite colleague, Judge Eugene Fahey, asked: "Does an intelligent nonhuman animal who thinks and plans and appreciates life as human beings do have the right to the protection of the law against arbitrary cruelties and enforced detentions visited on him or her?" (*Lavery*, 31 NY3d at 1058). When the majority answers, "No, animals cannot have rights," I worry for that animal, but I worry even more greatly about how that answer denies and denigrates the human capacity for understanding, empathy and compassion.

RIVERA, J. (dissenting):

> "The issue whether a nonhuman animal has a fundamental right to liberty protected by the writ of habeas corpus is profound and far-reaching. It speaks to our relationship with all the life around us" (*Matter of Nonhuman Rights Project,*

*Inc. v Lavery*, 31 NY3d 1054, 1059 [2018, Fahey, J., concurring]).

"An animal undoubtedly is a sentient being. It has emotions and can feel pain or joy. By nature each species has its own natural habitat. They require distinct facilities and environments for their behavioural, social and physiological needs. This is how they have been created . . . . To separate an elephant from the herd and keep it in isolation is not what has been contemplated by nature. Like humans, animals also have natural rights which ought to be recognized. It is a right of each animal, a living being, to live in an environment that meets the latter's behavioral, social and physiological needs" (*Islamabad Wildlife Mgmt. Bd. v Metropolitan Corp. Islamabad*, Islamabad High Ct, Pakistan, May 21, 2020, Athar-Minallah, C.J., W.P. No.1155/2019, slip op at 59).

Happy, an Asian elephant, has been held in captivity at the Bronx Zoo for decades. She is on display for the Zoo's visitors, who observe her from above while riding the Zoo's monorail. When they spot her, Happy likely stands nearly still, staring, swaying slightly, lifting and lowering one foot (*see* Jill Lepore, *The Elephant Who Could Be A Person*, Atlantic [Nov. 16, 2021] https://www.theatlantic.com/ideas/archive/2021/11/happy-elephant-bronx-zoo-nhrp-lawsuit/620672/). The Zoo has called this ride the "Wild Asia Monorail" and promises that it will take patrons "into the heart of the Asian wilderness" (Bronx Zoo, *Wild Asia Monorail*, https://bronxzoo.com/things-to-do/exhibits/wild-asia-monorail-seasonal [last visited June 3, 2022]). This is, quite simply, a fantasy. Visitors will not observe Happy in anything remotely resembling her natural environment. She does not, as she would in the wild, roam free with the other members of her herd—consisting of her mother, sisters, cousins, and potentially grandmothers—in Thailand, where she was born. She cannot—as is the common practice for the herd from which she was taken when she

was a baby calf—spend the vast majority of her waking hours traversing significant distances with her family to exercise, forage, and socialize (*see* World Wildlife Fund, *Asian Elephant*, https://www.worldwildlife.org/species/asian-elephant [last visited June 3, 2022] [describing Asian elephants as "extremely sociable, forming groups of six to seven related females that are led by the oldest female, the matriarch," who "spend up to 19 hours a day feeding . . . while wandering around an area that can cover up to 125 square miles"]).

The Zoo instead confines her in a one-acre indoor "elephant barn"—the same area that a human, walking at a moderate pace, would cross in about 30 seconds. Happy has limited access to an even smaller, walled outdoor area. Happy has outlived the other elephants that were similarly brought to this miserable existence, with one exception. The two are kept separated, though the Zoo permits them to occasionally touch trunks through the bars of their enclosures. Any myth that Happy is content in this environment is laid bare by the cruel reality of her existence. Day in and day out, Happy is anything but happy. There lies the rub—Happy is an autonomous, if not physically free, being. The law has a mechanism to challenge this inherently harmful confinement, and Happy should not be denied the opportunity to pursue and obtain appropriate relief by writ of habeas corpus. I dissent.

## I.

Not long ago, Judge Fahey presciently declared that we would eventually have to answer the question now squarely presented in this appeal: Can a nonhuman animal be entitled to release from confinement through the writ of habeas corpus? (*Lavery*, 31 NY3d at 1056 [Fahey, J., concurring]). The instant petition seeks Happy's release from the Zoo

and her transfer to an elephant sanctuary. But the appeal is not solely about Happy and her interests—although it is her body and her freedom at stake. We are here presented with an opportunity to affirm our own humanity by committing ourselves to the promise of freedom for a living being with the characteristics displayed by Happy. We are asked to recognize that the writ may be invoked because Happy is a sentient being, who feels and understands, who has the capacity, if not the opportunity, for self-determination. That recognition means that a court may consider whether to issue the writ because it is unjust to continue Happy's decades-long confinement in an unnatural habitat where she is held for the sole purpose of human entertainment. We cannot elide the question of Happy's legal rights and the use of the writ by a nonhuman animal with empty references to her "dignity" and "intelligen[ce]" (*see* majority op at 2, 16). A gilded cage is still a cage. Happy may be a dignified creature, but there is nothing dignified about her captivity.

In response to the question posed in this appeal and by Judge Fahey, I conclude that history, logic, justice, and our humanity must lead us to recognize that if humans without full rights and responsibilities under the law may invoke the writ to challenge an unjust denial of freedom, so too may any other autonomous being, regardless of species. Such an autonomous animal has a right to live free of an involuntary captivity imposed by humans, that serves no purpose other than to degrade life.

## II.

The writ of habeas corpus has its roots in the common law and predates the jurisprudential history of the original colonies. The writ is "the bulwark of the Constitution, the *magna charta* of personal rights" (*People ex rel. Tweed v Liscomb*, 60 NY 559, 566

[1875]). Its etymology is Latin, deriving, as relevant here, from the longer phrase "*habeas corpus ad subjiciendum*"; its literal translation is "that you have the body to submit," in the sense of producing the person held in captivity for judicial examination (Black's Law Dictionary [11th ed 2019], habeas corpus). The words are a command to the jailer. Thus, habeas corpus is a means of challenging, in court, some form of detention, and its essential purpose is to protect the right to liberty. The historical predecessor of federal and state habeas corpus is reverently called the Great Writ—a title we ascribe to modern conceptions of various writs of habeas corpus in recognition of the nobility of the fundamental promise of freedom protected by legal process. The title is well deserved, as the Great Writ ensures the fundamental right to be free from unjust imprisonment by requiring judicial review of the proffered justification for confinement. A court persuaded that the confinement is unjust must order immediate release of the body held.

I agree with Judge Wilson's comprehensive analysis of the availability of the writ of habeas corpus to present Happy's cause in our courts. As Judge Wilson explains, the majority incorrectly asserts that there is no legal precedent to recognize a nonhuman animal's right to habeas relief—although as my colleague states, even if true, that would be irrelevant, since novel questions merely present opportunities to develop the law (*see* Wilson, J., dissenting op at 51-57; *see also* majority op at 8-9). My colleague's historical recitation of the judicial use of habeas corpus is both thorough and compelling, and I write to emphasize my view that prior decisions do not foreclose Happy's petition and instead compel our acknowledgment of the availability of the writ to a nonhuman animal to challenge an alleged unjust confinement.

The human/nonhuman binary relied upon by the majority depends on a "rights and duties" framework that has no support in the historical application of the writ (*see generally People ex rel. Nonhuman Rights Project, Inc. v Lavery*, 124 AD3d 148, 150-152 [3d Dept 2014], *lv denied* 26 NY3d 902 [2015]). Indeed, the writ has not been limited to humans solely on the grounds that humans have rights and, in some cases, bear duties. Notwithstanding our country's tortured history of oppression and subjugation based on race, gender, culture, national origin, and citizenship, the writ has long been available to those whose humanity was never fully recognized by law. An African enslaved by whites was mere "chattel" property without rights of self-determination, but our Court, and others of this state, recognized that the writ still applied within this framework of legal white supremacy (*see Lemmon v People*, 20 NY 562 [1860]; *In re Belt*, 20 Edm Sel Cas 93 [Sup Ct, NY County 1848]; *In re Kirk*, 1 Edm Sel Cas 315 [NY Sup Ct 1846]; *see also Somerset v Stewart* 98 Eng Rep 499 [KB] [1772]). When women were legally subservient to their husbands, subject to violence without legal recourse, women could seek relief under the writ in common law courts, even though, under the dominant patriarchal legal system, they were denied the full rights granted to men and were absolved of certain legal duties (*see generally* Elizabeth Foyster, *At the Limits of Liberty: Married Women and Confinement in Eighteenth-Century England*, 17 Continuity & Change 39 [2002] [detailing how, despite the legal doctrine of coverture which subsumed a woman's legal personhood into that of her husband, women nonetheless resorted to writs of habeas corpus to seek release from confinement in their abusive husbands' homes or private insane asylums]). When certain Indigenous people sought to contest the legality of their arrest, following an attempted

return to their traditional homelands, the writ of habeas corpus permitted them to secure their liberty—notwithstanding the federal government's argument that Native Americans were not "persons" under the law (*see United States ex rel. Standing Bear v Crook*, 25 F Cas 695, 697 [CCD Neb 1879, No. 14,891]). We afford legal protections to those unable to exercise rights or bear responsibilities, such as minors and people with certain cognitive disabilities (*see People ex rel. Wehle v Weissenbach*, 60 NY 385 [1875]; *Matter of Brevorka ex rel. Wittle v Schuse*, 227 AD2d 969 [4th Dept 1996]).

Although not true for all nonhuman animals, there are some with advanced cognitive skills, who display self-determinative behavior, with an awareness of death and a capacity to grieve. These animals are autonomous beings. If an enslaved human being with no legal personhood (see Somerset, 98 ER 499), a Native American tribal leader whom the federal government argued could not be considered a person under law (see United States ex rel. Standing Bear, 25 F Cas 695), a married woman who could be abused by her husband with impunity (see Foyster), a resident of Puerto Rico who is a United States citizen deprived of full rights because of Puerto Rico's colonial status (Boumediene v Bush, 553 US 723, 756-757 [2008] ["In a series of opinions later known as the Insular Cases, the Court addressed whether the Constitution, by its own force, applies in any territory that is not a State . . . (and) held that the Constitution has independent force in these territories, a force not contingent upon acts of legislative grace"]; Cruz-Berrios v Borrero, 2020 WL 12814753, 2020 US Dist LEXIS 62848 [D PR, Mar. 30, 2020, No. 14-1232, Delgado-Colón, J.]), and an enemy combatant as defined by the federal government (see Boumediene, 553 US 723) can all seek habeas corpus relief, so can an autonomous

nonhuman animal[1].   Indeed, if a corporation—a legal fiction created to benefit some humans—can have constitutional rights protected in our courts, then the law can recognize an autonomous animal's right to judicial consideration of their claim to be released from an unjust captivity[2].

To be clear, I do not place nonhuman animals like Happy on equal footing with humans. Science and history establish that human beings' cognitive abilities far surpass those of nonhuman animals. The question is whether the writ can be invoked on behalf of a confined, nonhuman animal who is autonomous, notwithstanding human beings' generally superior intellect. As Judge Fahey so eloquently explained, "in elevating our

---

[1] That such individuals were able to make use of the writ of habeas corpus is particularly remarkable, given that their humanity was so roundly, routinely, and grotesquely diminished by the courts of this country, both within and without the context of habeas corpus (see e.g. Dred Scott v Sandford, 60 US 393, 407 [1857] [describing those of African origin "as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect"]; Johnson v M'Intosh, 21 US [7 Wheat] 543, 590 [1823] [denying Native Americans title to their traditional homelands, in part, on a theory that "the tribes of Indians inhabiting this country were fierce savages, whose occupation was war, and whose subsistence was drawn chiefly from the forest. To leave them in possession of their country, was to leave the country a wilderness"]; People v Hall, 4 Cal 399, 404-405 [1854] [denying individuals of Chinese origin the right to testify against whites because the former were "a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point, as their history has shown; differing in language, opinions, color, and physical conformation; between whom and ourselves nature has placed an impassable difference"]).

[2] The majority's attempt to distinguish corporations is unpersuasive (see majority op at 11). Corporations are not natural persons, and so the law acknowledges the obvious: you cannot lock up a corporation for violations of law. But that does not mean that corporate legal status is irrelevant or not a valid point of comparison here. Just as the law can recognize a form of legal personhood for a noncorporeal entity, so too can the law—the common law, in this case—be interpreted to recognize the legal right to challenge by writ of habeas corpus the alleged unjust captivity of a corporeal nonhuman animal.

species, we should not lower the status of other highly intelligent species" (Lavery, 31 NY3d at 1057).

For purposes of my legal analysis, I refer to humans who were denied full rights under the law to demonstrate the flexibility of the historical uses of the writ, and, in so doing, I do not undermine in any way the dignity of those individuals or diminish their struggles for equality and the right to live free. As Judge Wilson discusses, comparisons between animals and humans are fraught with the potential to ignore the ways that those comparisons have denied the dignity and personhood of people of color (see Wilson, J., dissenting op at 47-51) and individuals with disabilities. The legal and moral point of that analysis is that the Great Writ serves to protect against unjust captivity and to safeguard the right to bodily liberty, and that those protections are not the singular possessions of human beings. Indeed, humans bear a great responsibility to all living creatures precisely because of our intellectual and moral complexity, our ability to decide when it is necessary to hold others—humans and nonhuman animals alike—captive for the safety and benefit of humans. It is that capacity that further obligates us to act ethically and morally towards all beings so held.

Nevertheless, the majority mischaracterizes my and Judge Wilson's analyses as an "an odious comparison with concerning implications" (majority op at 10). The majority has profoundly misconstrued the point. As both Judge Wilson and I have made abundantly clear, no one is equating enslaved human beings or women or people with cognitive disabilities with elephants. Rather, we merely highlight a historical truth: Even when those classes of human beings have, by operation of law, been denied legal recognition of their

humanity, the writ of habeas corpus was still available to them. The majority ignores this history, preferring instead the comforting incoherence of its circular logic: Humans have "the right to liberty . . . because they are humans with certain fundamental liberty rights" (*id*. at 9). This is question begging in its purest form. The majority's argument boils down to a claim that animals do not have the right to seek habeas corpus because they are not human beings and that human beings have such a right because they are not animals. But, of course, humans are animals. And glaringly absent is any explanation of why some kinds of animals—i.e., humans—may seek habeas relief, while others—e.g., elephants—may not. The majority's suggestion that the "fundamental liberty rights" of human beings are "recognized by law" (*id.*) is nothing more than a tautological evasion[3]. Whether autonomous, nonhuman animals have rights that ought to be "recognized by law" is *precisely* the question we are called upon to answer in this appeal.

The immensity of that question does not place it exclusively within the domain of the legislature (*see id.* at 17). As even the majority concedes, "the courts—not the legislature—ultimately define the scope of the common law writ of habeas corpus" (*id.* at 17). While CPLR article 70 sets forth the *procedure* to seek habeas relief, it does not create

---

[3] It is not a particularly convincing evasion, in any event. Under the majority's view, captives must apparently already have "certain fundamental liberty rights recognized by law" before seeking a writ of habeas corpus (majority op at 9). The most cursory examination of this Court's decision in *Lemmon* demonstrates how utterly false that claim is, for if legal recognition of a human captive's "fundamental liberty" were a precondition of habeas relief, the Court would never have granted such relief to enslaved people who were, for all legal purposes, treated as nothing more than chattel. Indeed, in Lemmon, the Court did not merely grant the habeas petition in the *absence* of any recognition of the enslaved individuals' fundamental rights but did so in *direct contravention* of the Supreme Court's holding in *Dred Scott*.

the right to bodily liberty nor determine who may seek such relief. Rather, the writ "is not the creature of any statute" (*People ex rel. DeLia v Munsey*, 26 NY3d 124, 130 [2015]). Thus, it is for this Court to decide the contours of the writ based on the qualities of the entity held in captivity and the relief sought. The difficultly of the task—i.e., determining the reach of a substantive common law right whose existence pre-dates *any* legislative enactment on the subject and whose core guarantees are unalterable by the legislature—is no basis to shrink from our judicial obligation by recasting it as the exclusive purview of the legislative branch. The common law is our bailiwick.

To be clear, the legislature may expand a nonhuman animal's rights against cruel treatment and inhumane conditions, but the legislature may not limit rights that spring from an animal's status as an autonomous being. Put another way, statutory rights may expand existing rights and protections for nonhuman animals—and humans—but the fundamental right to be free is grounded in the sanctity of the body and the life of autonomous beings and does not require legislative enactment. That is not to say that the legislature cannot set forth prescriptive laws of conduct, which if violated may result in confinement. But the question here is about an unjust confinement. Happy has committed no crime. She has not forfeited her right to liberty by inflicting harm on humans or even another animal. To the contrary, Happy has done nothing but be born an elephant, and thereby attracted human curiosity. As I discuss below, that desire to observe Happy at the pleasure of and on the terms set by human beings has come at a great cost to her and to our society.

III.

Whether the writ should issue turns on both the individual captive and the relief sought. Based on the record developed below, the Nonhuman Rights Project has made the case for Happy's release and transfer to an elephant sanctuary, and the writ should therefore be granted.

Happy is not a human being—that is, she is not a member of the species *Homo sapiens*. However, she is a mammal and thus shares common aspects of mammalian life and community that are familiar to humans. Elephants bear children and live in herds, where they pass down and communicate to one another rules for survival. Happy was born in a wild environment and, if humans had not captured her when she was an infant, she would have lived out her days among other wild animals, separate from humans.

In support of the petition for the common law writ of habeas corpus seeking Happy's release and in opposition to the motion to dismiss, the Nonhuman Rights Project submitted affidavits from several internationally renowned elephant experts to establish Happy's autonomy and the inherent harm of her captivity in the Zoo. Among them is Joyce Poole, Ph.D., a recognized expert in elephant behavior who has studied elephants in the field for over 40 years. Dr. Poole trained at Smith College, the University of Cambridge, and Princeton University. Dr. Poole is the Co-Director of ElephantVoices, a non-profit that seeks to promote public awareness of elephant's intellectual and behavioral complexity and to secure a better future for elephants through research, conservation, advocacy, and the sharing of knowledge. Dr. Poole's extensive fieldwork, on both African and Asian elephants, has led to her publication of dozens of peer-reviewed journal articles, book

chapters, and monographs on elephants. Her work has earned her significant public

recognition, including awards and various research fellowships from, among others, the

National Institute of Mental Health, the New York Zoological Society, and the California

State Legislature. Her expertise has been featured widely in media outlets around the world,

and she has served as an expert witness in several countries in cases involving the wellbeing

of elephants.

Dr. Poole's expert opinion, encapsulated in her affidavit and unrebutted by

respondents, builds on her decades of rigorous study of elephants in the wild as well as her

deep knowledge of the scientific literature on elephants. Her conclusions are excerpted at

length, as they are critical to the merits of the habeas petition:

> "Elephants are autonomous beings. Autonomy in humans and nonhuman animals is defined as self-determined behaviour that is based on freedom of choice. As a psychological concept it implies that the individual is directing their behaviour based on some non-observable, internal cognitive process, rather than simply responding reflexively.
>
> . . .
>
> "[T]he physical similarities between human and elephant brains occur in areas that link directly to the capacities necessary for autonomy and self-awareness.
>
> . . .
>
> "Elephants clearly and frequently display empathy in the form of protection, comfort and consolation, as well as by actively helping those who are in difficulty, such as assisting injured individuals to stand and walk, or helping calves out of rivers or ditches with steep banks. Elephants have been observed to react when anticipating the pain of others (e.g. seen to wince when a nearby elephant stretched her trunk toward a live wire) and have even been observed feeding those who are not able to use their own trunks to eat and to attempt to feed those who have just died.

. . .

"[E]lephants share many behavioural and intellectual capacities with humans, including: self-awareness, empathy, awareness of death, intentional communication, learning, memory, and categorisation abilities. Many of these capacities have previously been considered—erroneously—to be uniquely human, and each is fundamental to and characteristic of autonomy and self-determination.

. . .

"[E]lephants appear to realise that once dead, the carcass cannot be helped anymore, and instead engage in more 'mournful' behaviour, such as standing guard over the bodies, and protecting it from the approaches of predators. Others have observed them covering the bodies of dead elephants with dirt and vegetation. In the particular case of mothers who lose a calf, although they may remain with the calf's body for an extended period, they do not behave towards the body as they would a live calf. Indeed, the general demeanour of elephants who are attending to a dead elephant is one of grief and compassion, with slow movements and few, if any, vocalisations. These behaviours are akin to human responses to the death of a close relative or friend, and illustrate that elephants possess some understanding of life and the permanence of death" (inline citations omitted).[4]

---

[4] In support of these factual assertions and opinions, Dr. Poole included citations to Lucy A. Bates et al., *Do Elephants Show Empathy?*, 15 J Consciousness Stud (No. 10-11) 204 (2008); Iain Douglas-Hamilton, *On the Ecology and Behaviour of the African Elephant* (1972) (D. Phil. Thesis, University of Oxford); Phyllis C. Lee, *Allomothering Among African Elephants*, 35 Animal Behav 278 (1987); Karen McComb et al., *African elephants show high levels of interest in the skulls and ivory of their own species*, 2 Biology Letters 26 (2005); Cynthia J. Moss, *Portraits in the Wild* (2d ed 1982); Cynthia J. Moss, *Elephant Memories: Thirteen Years in the Life of an Elephant Family* (1988); Cynthia J. Moss, *Echo of the Elephants: The Story of An Elephant Family* (1992); Katy Payne, *Sources of Social Complexity in the Three Elephant Species*, in Animal Social Complexity: Intelligence, Culture, and Individualized Societies (Frans B.M. de Waal & Peter L. Tyack , eds. 2003); Joyce Poole, *Coming of Age with Elephants* (1996). She further relied on various personal observations and communications with other elephant researchers.

The record is replete with affidavits from other leading voices in the field, similarly describing and opining on elephants' complex cognitive abilities and self-determinative behavior. For example, Lucy Bates, Ph.D., a postdoctoral research fellow at the University of Sussex, has studied elephant cognition and social behavior for over a decade; Richard Byrne, Ph.D., is a Fellow of the Royal Society of Edinburgh, who has studied animal cognition and the evolutionary aspects of intelligence for nearly 50 years and has spent years observing and studying elephants; Karen McComb, Ph.D., a professor at the University of Sussex, has spent decades studying emotional awareness and communication in various mammal species, including elephants; Cynthia J. Moss, D.Sc., has spent the last 50 years observing and researching elephants in southern Kenya, including as Director of the Amboseli Elephant Research Project, where she has supervised research and monitoring of elephants in the Amboseli National Park, trained elephant researchers, carried out surveys and training courses at other elephant study sites in Africa, and promoted public awareness on behalf of elephants. Collectively, these experts have published hundreds of peer-reviewed articles, book chapters, and books on a range of topics concerning, *inter alia*, animal—and specifically elephant—cognition, intelligence, and social behavior. Many have served as expert witnesses in legal proceedings in which they were called upon to give their professional opinions on certain facets of elephant wellbeing. All were, undoubtedly, eminently qualified to serve as experts, and Supreme Court was wholly justified in relying on their opinions in making its findings.

Respondent Wildlife Conservation Society (WCS) submitted affidavits in support of its motion to dismiss describing its nonprofit status and mission and confirming Happy's

decades-long confinement at the Zoo. WCS asserted that the Bronx Zoo is accredited by

the Association of Zoos and Aquariums and is in compliance with that organization's

elephant-specific standards. Respondent's expert affidavits asserted that Happy receives

excellent veterinary care and would suffer harm if she were moved to a sanctuary.

Critically, respondent failed to address the Nonhuman Rights Project's core argument that

the writ should issue because Happy's confinement at the Zoo was a violation of her right

to bodily liberty as an autonomous being, regardless of the care she was receiving.

After a three-day hearing, Supreme Court issued a decision concluding that the

Nonhuman Rights Project's expert affidavits "demonstrated" that

> "Happy possesses complex cognitive abilities sufficient for
> common law personhood and the common law right to bodily
> liberty. These include: autonomy; empathy; self-awareness;
> self-determination; theory of mind (awareness that others have
> minds); insight; working memory; an extensive long-term
> memory that allows them to accumulate social knowledge; the
> ability to act intentionally and in a goal-oriented manner, and
> to detect animacy and goal directedness in others; to
> understand the physical competence and emotional state of
> others; imitate, including vocal imitation; point and understand
> pointing; engage in true teaching (taking the pupil's lack of
> knowledge into account and actively showing them what to
> do); cooperate and build coalitions; cooperative problem-
> solving, innovative problem-solving, and behavioral
> flexibility; understand causation; intentional communication,
> including vocalizations to share knowledge and information
> with others in a manner similar to humans; ostensive behavior
> that emphasizes the importance of particular communication;
> wide variety of gestures, signals and postures; use of specific
> calls and gestures to plan and discuss a course of action, adjust
> their plan according to their assessment of risk, and execute the
> plan in a coordinated manner; complex learning and
> categorization abilities; and, an awareness of and response to
> death, including grieving behaviors" (2020 WL 1670735, at *3

[Sup Ct, Bronx County, Feb. 18, 2020, index No. 260441/19,
Tuitt, J.]).

The court further explained that the unrebutted expert affidavits established "that Happy is an extraordinary animal with complex cognitive abilities, an intelligent being with advanced analytic abilities akin to human beings" and "that Happy is more than just a legal thing, or property.[5] She is an intelligent, autonomous being who should be treated with respect and dignity, and who may be entitled to liberty" (*id.* at *10).

The court stated it was "extremely sympathetic to Happy's plight," but on constraint of Appellate Division caselaw, the court "[r]egrettably . . . [was] bound by the legal precedent" to grant the motion to dismiss because Happy could not be treated as a person for purposes of habeas corpus (*id.* at *9). The First Department affirmed, holding that "the writ of habeas corpus is limited to human beings" and that only the legislature could recognize nonhuman animals' rights to habeas relief (189 AD3d 583, 583 [1st Dept 2020]).

We may not ignore Supreme Court's determination that Happy is an autonomous animal, which was based on the record before it and which was left undisturbed by the Appellate Division's affirmance based strictly on what Supreme Court perceived as the dispositive legal barrier to issuing the writ (*see People v Sawyer*, 96 NY2d 815, 816 [2001] ["(W)here the determinations by courts with fact-finding authority are supported by the

---

[5] The majority has seemingly overlooked Supreme Court's lengthy conclusions and explicit examples of what precisely constitute the "complex cognitive abilities sufficient for common law personhood and the common law right to bodily liberty" (2020 WL 1670735, at *3), and insists that Judge Wilson and I have provided "no clear standard for determining which species are entitled to access the writ" (majority op at 13). Instead, it seems that what the majority derides as standardless is, in fact, merely a standard with which it disagrees.

record they are beyond the further review of this Court"]). Thus, the finding that Happy is autonomous stands. The next question is whether Happy may be released solely for purposes of transfer to an elephant sanctuary.

Here, too, I agree with Judge Wilson that the writ of habeas corpus may be invoked for transfer from one facility to another (*see* Wilson, J., dissenting op at 30-32, 33). The majority's contrary view is based on an erroneous reading of prior case law. In *People ex rel. Dawson v Smith*, this Court explained that habeas could be used to seek transfer from one facility to another (69 NY2d 689, 691 [1986], citing *People ex rel. Brown v Johnston*, 9 NY2d 482 [1961]; *see also Lavery*, 31 NY3d at 1058-1059 [Fahey, J., concurring] ["(H)abeas corpus can be used to seek a transfer to 'an institution separate and different in nature from the . . . facility to which petitioner had been committed,' as opposed to a transfer 'within the facility'"], quoting *People ex rel. Dawson*, 69 NY2d at 691).

Apart from this precedent, there is another basis to conclude that transferring Happy to an elephant sanctuary is an appropriate form of habeas relief in this case. As discussed by Judge Wilson, and suggested by Judge Fahey's concurrence, the writ is flexible and has been applied innovatively by courts to achieve a just and workable outcome (*see* Wilson, J., dissenting op at 33-34, 52; *see also Lavery*, 31 NY3d at 1057-1058). Thus, while the writ provides for release of the "body" that is held captive, it also allows for consideration of the proper conditions of a release when, as here, the captive is a nonhuman animal and cannot live as a free being within human society. The Zoo gates cannot simply be swung open to allow Happy to roam Southern Boulevard or Pelham Parkway, or to walk the grounds of the adjacent Botanical Gardens or the neighboring campus of Fordham

University.[6] As all parties recognize, immediate release would be dangerous for both elephant and humans, with potentially fatal consequences for Happy.

It is obvious that Happy is unlike the domesticated animals that now live, at times comfortably, among humans, such as dogs, cats, horses, chickens, and hamsters. Unlike those species, hers was not shaped through thousands of years of intentional selective breeding by humans, which has accommodated these animals to human communities, close human interaction, and human caretakers. Unlike those species, elephants' evolutionary path has not been guided by human need over the millennia. In short, elephants exist wholly apart from human society, save for when human beings upset that natural order through their intervention. Put simply, Happy, as with all elephants, has not evolved to dwell alongside humans as some domesticated animals have. She may instill in human beings a sense of awe, but to justify her captivity on the basis of human entertainment alone is to "to regard [her] as entirely lacking independent worth, as a mere resource for human use, a thing the value of which consists exclusively in its usefulness to others" (*Lavery*, 31

---

[6] This would not be Happy's first encounter with Fordham. She was previously forced to play tug-of-war with the University's football team on multiple occasions. Her participation was induced on threat of being "whack[ed] . . . mightily on [her] thick-skinned side with a bull hook" by the elephant trainer employed by the Zoo (*see* Lepore). "The bullhook—a rod with a blunt or pointed hook at one end—has been used for centuries to get elephants to do humans' bidding" (Karin Brulliard, *Some of America's top zoos still use bullhooks on elephants. That's about to change*, Washington Post [Aug. 21, 2019] https://www.washingtonpost.com/science/2019/08/21/some-americas-top-zoos-still-use-bullhooks-elephants-thats-about-change/). The Association of Zoos and Aquariums "previously defended bullhooks as essential management tools" but, in an apparent act of beneficence, has recently voted to phase out their use by 2023 (*id.*).

NY3d at 1058 [Fahey, J., concurring]).[7] She—and other wild animals—exist naturally beyond the control of human beings and in an environment suited to these animals but inhospitable to most humans.[8]

The fact that Happy cannot be set totally free on the streets of New York City is a consequence of human beings' attempts to exert such unnatural control over her. Humans removed her as a calf from her natural habitat. Humans separated her from her herd. After a lifetime of captivity, in which humans have controlled every aspect of her life, she cannot return, fifty years later, and simply live as would any elephant who grew up in a wild environment. However, a court can order the most practical and humane alternative: transfer to an elephant sanctuary. This is the safest place for Happy because it most closely approximates her natural environment. The sanctuary that has offered to accept Happy at no cost, the Performing Animal Welfare Society (PAWS) in California, sits on a property encompassing 2,300 acres of natural terrain with varied habitats, including grasslands,

---

[7] The majority's speculation that Happy's captivity is not for the benefit of human entertainment (majority op at 17 n 2) is belied by the fact that the Zoo previously allowed patrons to ride her (*see* Lepore). Although the zoo no longer "coaxes" happy to walk around in a small circle with a human on her back, it displays her from a monorail, a Disney-esque experience meant to amuse the rider.

[8] This reality also disproves the majority's claim that recognizing Happy's right to bodily liberty "would have an enormous destabilizing impact on modern society" (majority op at 12). Happy's captivity, half a world away from her native habitat in an utterly unnatural setting, serves no purpose upon which society depends. To the extent that the majority and respondent WCS suggest that Happy's confinement promotes conservation (*see* majority op at 17 n 2), there are certainly ways to introduce humans to wildlife and raise public awareness of the threats facing the animal kingdom that do not depend on the confinement of autonomous, nonhuman animals. That is all the more true as regards Happy, who was taken from her native habitat, thereby decreasing the wild population of Asian elephants.

forested areas, and bodies of water in which elephants can bathe. The weather permits the elephants to be outdoors year-round, where they may engage in natural behavior, such as foraging, dustbathing, and wallowing in mud. Most elephants at the sanctuary are able to move freely between in- and outdoors at night. Significantly, the elephant habitats are spacious enough to allow for social group activity. The sanctuary provides the best opportunity for humans to mitigate the harm caused by Happy's captivity by allowing her to live out the remaining years of her life in a place suited to her specific needs, and more reminiscent of her birthplace than her current one-acre enclosure at the Zoo.

IV.

Captivity is anathema to Happy because of her cognitive abilities and behavioral modalities—because she is an autonomous being. Confinement at the Zoo is harmful, not because it violates any particular regulation or statute relating to the care of elephants, but because an autonomous creature such as Happy suffers harm by the mere fact that her bodily liberty has been severely—and unjustifiably—curtailed. Happy's confinement by human beings has never been intended to benefit her but serves only to entertain and satisfy human curiosity, regardless of the loss of freedom to Happy. She is held in an environment that is unnatural to her and that does not allow her to live her life as she was meant to: as a self-determinative, autonomous elephant in the wild. Her captivity is inherently unjust and inhumane. It is an affront to a civilized society, and every day she remains a captive—a spectacle for humans—we, too, are diminished.

Order affirmed, without costs. Opinion by Chief Judge DiFiore. Judges Garcia, Singas, Cannataro and Troutman concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs in part in a separate dissenting opinion.

Decided June 14, 2022